# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL LOZANO, on behalf of himself
and all others similarly situated
and as a private attorney general
on behalf of the members of the
general public residing within the
State of California,
                *Plaintiff-Appellee-*
                *Cross Appellant,*

        v.

AT&T WIRELESS SERVICES, INC., a
Delaware Corporation,
            *Defendant-Appellant-*
            *Cross Appellee.*

Nos. 05-56466
     05-56511

D.C. No.
CV-02-00090-AHS

OPINION

Appeal from the United States District Court
for the Central District of California
William J. Rea, District Judge, Presiding*

Argued and Submitted
June 4, 2007—Pasadena, California

Filed September 20, 2007

Before: Cynthia Holcomb Hall and Consuelo M. Callahan,
Circuit Judges, and James L. Robart,** District Judge.

Opinion by Judge Robart

---

*After this appeal was filed, the Honorable Alicemarie H. Stotler
replaced the late Honorable William J. Rea as presiding judge in this case.

**The Honorable James L. Robart, United States District Judge for the
Western District of Washington, sitting by designation.

12745

**COUNSEL**

J. Paul Gignac (argued) and Katherine Donoven, Arias, Ozzello & Gignac, LLP, Santa Barbara, California, and Peter Bezek and Robert A. Curtis, Foley Bezek Behle & Curtis, LLP, Santa Barbara, California, for the plaintiff-appellee-cross appellant.

James C. Grant (argued) and Kelly Twiss Noonan, Stokes Lawrence, P.S., Seattle, Washington, and Mark E. Weber and Gabriel J. Pasette, Gibson, Dunn & Crutcher, LLP, Los Angeles, California, for the defendant-appellant-cross appellee.

## OPINION

ROBART, District Judge:

This opinion addresses cross-appeals of the district court's order denying in part, and granting in part, Paul Lozano's class certification motion. Lozano appeals the district court's denial of a nationwide class for his Federal Communications Act ("FCA") and declaratory relief claims. Lozano also appeals the court's denial of a California subclass on these claims, as well as his breach of contract claim. AT&T Wireless Services, Inc. ("AWS") appeals the district court's certification of a California subclass for Lozano's state law claims. We have jurisdiction to hear this appeal pursuant to Rule 23(f) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1292(e). For the reasons stated, we affirm in part and reverse in part.

## I.  Background

Lozano is a customer of AWS and brought this putative class action based on AWS's disclosures relating to its billing practices for cellular services.[1] On October 4, 2004, Lozano filed a Second Amended Complaint in the district court. In his complaint, Lozano asserts claims under the FCA, the Declaratory Judgment Act ("DJA"), California contract law, the California Consumer Legal Remedies Act ("CLRA"), and California Unfair Competition Law ("UCL"). Lozano bases these claims on allegations that AWS billed its customers for cellular telephone calls during a billing period other than the billing period in which the calls were made, a practice termed "out-of-cycle billing." Lozano contends that by doing this, AWS assessed charges for cellular telephone calls that would

---

[1]Lozano brought this suit against AWS, AT&T Wireless Services of California, and Santa Barbara Cellular Systems. Only AWS sought a petition for interlocutory review of the district court's order on class certification.

not have been assessed if the calls had been billed during the billing period in which the calls were made. AWS, according to Lozano, did not fully and adequately disclose its billing practice to its customers at the time they entered into contracts with AWS.

## A. Out-of-Cycle Billing

Out-of-cycle billing occurs when the local calling area for a customer's plan includes areas that are not covered by AWS's cellular network. When a customer places or receives a call in an area not covered by AWS's network, the call is routed through another wireless carrier, and the call is termed a "roaming call." Due to the nature of the routing process, AWS does not immediately learn of the roaming call, and consequently, does not immediately charge the call against the customer's allotted minutes. Occasionally, AWS will learn of the roaming call only after the customer's monthly billing cycle has ended. When this occurs, AWS bills the customer for the roaming call in the next billing cycle, which may put the customer over the allotted minutes for that cycle. For example, a roaming call made in the August billing cycle may be billed in the September invoice because of the late receipt of information from the other carrier. Assuming the customer had already reached his or her allowable minutes for September, and had not for August, the August roaming call could result in an overage fee on the September invoice. According to AWS, out-of-cycle billing occurs infrequently, and when it does occur, it is just as likely to result in a reduction in fees as opposed to an increase. That is, under the above scenario, the customer could benefit from out-of-cycle billing by avoiding an overage fee in August if she used all her minutes in August, but not September.

In or about May 2001, Lozano contracted with AWS to receive cellular telephone service for one year. Lozano's cellular plan with AWS provided him with a minimum of 400 "free anytime minutes" and 1,000 "night and weekend min-

utes" per month. As part of a promotional offer, AWS gave Lozano an additional 200 free anytime minutes. Based on the information AWS provided, Lozano believed that he would not be charged for cellular calls unless he exceeded 600 anytime minutes or 1,000 night and weekend minutes in one billing cycle.

When Lozano received his September 18, 2001 invoice from AWS, however, he was surprised to discover that his September invoice included calls that were made during the previous billing cycle. The addition of these extra minutes caused his September usage to exceed the "free" minutes set forth in his contract with AWS. Because he exceeded his allotted usage, AWS charged Lozano an overage fee for the calls that it billed from the previous cycle.

Lozano called AWS to inquire as to why there were calls from the previous billing cycle on his current invoice. An AWS representative explained to him that roaming cellular telephone calls are billed to its customers based on the date that AWS receives the information regarding the call, not on the date the call was actually made. The AWS representative offered to reimburse Lozano for the overage charges, but would not do so unless he agreed to sign-up for another year of service with AWS. Lozano declined the offer. On October 25, 2001, after Lozano lodged additional complaints with AWS, it issued him a credit for the charges he incurred as a result of out-of-cycle billing. The AWS representative who issued the credit wrote in the customer notes that it "was a ONE TIME COURTESY CR[EDIT] for delayed billing . . . ." The representative informed Lozano that out-of-cycle billing could happen again. Lozano filed the instant suit a few weeks later, and the credit appeared on Lozano's November invoice from AWS.[2]

_____

[2]In its preceding order on summary judgment, the district court found that AWS reimbursed Lozano only after realizing that Lozano was instigating legal proceedings against it.

AWS contends it fully discloses the implications of out-of-cycle billing in its Welcome Guide, which customers receive when they sign-up for service. Lozano does not dispute that he received a copy of the Welcome Guide when he purchased his service from AWS. Indeed, Lozano admits that the AWS salesperson "paged through" the Welcome Guide with Lozano, and gave him the opportunity to ask any questions. Lozano instead contends that these disclosures are not adequate to inform the consumer of AWS's out-of-cycle billing practices.

## B.  Arbitration Agreement

The Welcome Guide Lozano received also contains an arbitration agreement that prohibits class actions:

> Any dispute or claim arising out of or relating to this Agreement or to any product or service provided in connection with this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory) will be resolved by binding arbitration . . . . [Y]ou and we both waive any claims for punitive damages and any right to pursue claims on a class or representative basis.

Shortly after Lozano filed this putative class action lawsuit, AWS moved to compel arbitration.

The district court initially granted AWS's motion to compel arbitration. AWS then filed for a writ of mandamus with this court. We denied the writ, but instructed the district court to reconsider its ruling in light of *Ting v. AT&T*, decided after the district court's order compelling arbitration. 319 F.3d 1126, 1150 (9th Cir. 2003) (finding class action waivers in arbitration agreements to be unconscionable when contained in adhesion contracts). On August 18, 2003, after reconsidering its order in light of *Ting*, the district court vacated the order compelling arbitration. In so doing, the district court

relied both on *Ting*, and the subsequent case of *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1176 n.15 (9th Cir. 2003) (holding that "an essentially unilateral bar on class-wide arbitration is substantively unconscionable"). The district court held that the limitation on class action relief contained in AWS's Welcome Guide was both procedurally and substantively unconscionable and therefore unenforceable under California law.[3]

## C. Lozano's Injury

The district court considered AWS's motion for summary judgment before Lozano sought class certification. In its summary judgment order, the district court addressed whether Lozano had any legally cognizable injuries, in order to determine whether he had standing to bring his claims. AWS argued that because it had reimbursed Lozano for the out-of-cycle overage fees in October 2001, and he did not bring suit until November 2001, he could not show injury. The district court disagreed. While recognizing that AWS's reimbursement to Lozano before suit raised concerns regarding Lozano's ability to meet an essential element of his claims, i.e., damages, the district court nevertheless concluded that (1) AWS could not avoid a class action by reimbursing the potential representative prior to filing suit; and (2) Lozano suffered damages based on a so-called "reservation" injury, and that AWS's use of out-of-cycle billing continued to injure Lozano. The "reservation" injury, as described by the district court, relates to those AWS customers who are aware of out-of-cycle billing, and in turn, reserve a certain percentage of minutes each month to compensate for any late-charged roaming calls from the previous billing cycle. The customer is thereby denied the full use of his or her allotted minutes each month. On these bases, the district court found that Lozano suffi-

---

[3]AWS appealed the district court's order denying arbitration, but voluntarily dismissed this appeal when we accepted the parties' petitions for interlocutory review of the district court's class certification order.

ciently alleged the presence of an injury, and had standing to bring these claims.[4]

## D.    Class Certification

The district court next considered Lozano's motion for class certification. In his motion, Lozano requested that the court certify two classes: (a) one national class for claims based on FCA violations, declaratory relief, and breach of contract; and (b) another California subclass based on Lozano's state-law claims brought pursuant to the CLRA and UCL. Lozano termed the first class as "the Class" and the subclass as "the California Subclass."

Lozano's proposed definition for the Class included:

> all residents of the United States of America who initiated cellular telephone service with AT&T Wireless on or after March 1, 1999 and who at any time between March 1, 1999 and the date of filing the Second Amended Complaint in this action have been charged by AT&T Wireless for cellular telephone calls during a billing period other than the billing period in which the calls were made.

Lozano proposed an identical subclass for his state claims, except that this definition only included residents of the State of California.

---

[4]Lozano does not attack the actual practice of out-of-cycle billing, presumably because section 332 of the FCA would preempt such a claim. *See* 47 U.S.C. § 332(c)(3)(A) (prohibiting states from regulating the entry of or the rates charged by any commercial mobile service or any private mobile service). Here, in order for Lozano to maintain his UCL claim, while avoiding FCA preemption, his claim must be tied to the unfairness of AWS's disclosures regarding its billing practices, and not to the practices themselves.

The district court declined to certify a national class for Lozano's FCA and derivative DJA claims because to do so would require a state-by-state analysis of conscionability jurisprudence with respect to the enforceability of class action waivers. The court also denied Lozano's request for class action status for his breach of contract claim. The district court certified a California class action for Lozano's CLRA claim, based on AWS's inclusion of an unconscionable term in its agreement, i.e., the class action waiver; the district court declined to certify a class for Lozano's other theories of liability pursuant to the CLRA. Finally, the district court certified a class action on two theories of liability under the UCL; one claim based on a violation of the CLRA (the "derivative UCL claim") and a second claim based on the "unfairness" prong of the UCL.

## II.    Standards of Review

Class certifications are governed by Federal Rule of Civil Procedure 23. As the party seeking class certification, Lozano bears the burden of demonstrating that he has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b).[5] *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). We review the district court's decision regarding class certification for abuse of discretion. *See Valentino v. Carter-Wallace, Inc.*, 97

---

[5]The Federal Rules of Civil Procedure allow class certification if the proponent shows: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Additionally, the class action proponent must meet one of the requirements set forth in Rule 23(b). Here, the district court's class certification order is based primarily on its analysis of the additional requirement found in Rule 23(b)(3); that is, whether questions of law or fact "common to the members of the class predominate over any questions affecting only individual members and that class action is superior to other available methods." Fed. R. Civ. P. 23(b)(3).

F.3d 1227, 1234 (9th Cir. 1996). The district court abuses its discretion if its certification order is premised on impermissible legal criteria. *See Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 479 (9th Cir. 1983). Finally, while we review the district court's factual findings under the clearly erroneous standard, *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002), we review the district court's determination of standing and mootness *de novo*. *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 n.11 (9th Cir. 2002) (standing); *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 850 (9th Cir. 2002) (mootness).

## III.   Discussion

### A.   Arbitration of FCA Claims

Lozano first contends that the district court erred by finding predominance of individual claims based on differing state laws on whether class action waivers are unconscionable. The district court, according to Lozano, should not have considered the variances in state law on this issue because, as a matter of federal law, no claim can be subject to arbitration under the FCA. Lozano contends that the FCA's plain language precludes adjudication by arbitration. Whether the FCA permits adjudication by binding arbitration is a question of law that we review *de novo*. *See S.E.C. v. Gemstar-TV Guide Intern., Inc.*, 401 F.3d 1031, 1044 (9th Cir. 2005).

**[1]** The Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate a controversy shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA sets forth a liberal federal policy favoring arbitration and reverses years of hostility by the courts towards arbitration agreements. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Contractual arbitration agreements are equally applicable to statutory claims as to other types of common law claims. *See Mitsu-*

*bishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985). Indeed, the *Mitsubishi* Court went so far as to state that, absent the sort of "fraud or overwhelming economic power that would provide grounds for the revocation of any contract," the FAA "provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability." *Id.* (citations and internal quotation marks omitted).

This does not mean that all statutory rights are suitable for arbitration. There are some statutes where Congress has evinced an intent to preclude arbitration of claims. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude arbitration of the statutory claims involved. *See Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 227 (1987); *Nghiem v. NEC Elect., Inc.*, 25 F.3d 1437, 1441 (9th Cir. 1994). Lozano attempts to meet this burden by arguing that Congress, by limiting fora to the Federal Communications Commission ("FCC") and federal district courts, evidenced an intent to preclude other fora, including arbitration. As additional support, Lozano points to this court's decision in *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002), as controlling authority on the issue.

The district court rejected both of Lozano's arguments. Relying on the standard set forth in *Mitsubishi*, the district court found no evidence of a congressional intent to prohibit arbitration of FCA claims.[6] The district court also found our holding in *Coeur d'Alene Tribe* to be confined to the adjudication of claims in the tribal forum. We agree.

---

[6]At least two other federal courts have implicitly recognized the right of parties to agree to arbitrate their FCA claims. *See Penberthy v. AT&T Wireless Servs.*, 354 F. Supp. 2d 1323, 1328 (M.D. Fla. 2005); *In re Univ. Serv. Fund Tele. Billing Prac. Lit.*, 300 F. Supp. 2d 1107, 1134 (D. Kan. 2003).

1. Congressional Intent

**[2]** If congressional intent to bar arbitration exists in the FCA, it must be found in the text of the statute, its legislative history, or "an inherent" conflict between arbitration and the FCA's underlying purpose. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991). Lozano argues that because important public policy considerations are litigated in FCA claims, Congress intended to limit the adjudication of these claims to the FCC and the federal district courts, and to the exclusion of an arbitral forum. Lozano also argues that, due to the inherent inequality in unequal bargaining power between telecommunications providers and consumers, Congress intended to preclude providers from keeping consumers out of a judicial forum. While we recognize these as important public policy considerations, the United States Supreme Court has rejected these same arguments in other statutory contexts, in light of the strong public policy favoring arbitration.

**[3]** For example, the Supreme Court in *McMahon* evinced a strong desire to permit arbitration of statutory claims by upholding an arbitration agreement that encompassed federal claims arising under the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations ("RICO") statutes. 482 U.S. at 242. The Court found RICO claims arbitrable even in the face of RICO's strong public policy considerations. *See id.* ("The special incentives necessary to encourage civil enforcement actions against organized crime do not support nonarbitrability of run-of-the-mill civil RICO claims brought against legitimate enterprises."); *see also Mitsubishi*, 473 U.S. at 632 (reasoning that arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust claims); *Gilmer*, 500 U.S. at 35 (holding that employment claims brought pursuant to the Age Discrimination in Employment Act of 1967 are subject to mandatory arbitration); *Green Tree Fin'l Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000) (holding claims brought under the

Truth in Lending Act, a statute designed to "further important social policies," are arbitrable). Accordingly, we conclude that, even considering the important public policy concerns associated with FCA claims, these claims are arbitrable absent evidence of congressional intent to the contrary.

**[4]** Lozano also argues that, based on the inequality in bargaining power between consumers and communications companies, FCA claims should not be arbitrable. The Supreme Court has likewise rejected this argument. In *Gilmer*, the Court held that "[m]ere inequality in bargaining power . . . is not sufficient reason to hold that arbitration agreements are never enforceable in the employment context. Relationships between securities dealers and investors, for example, may involve unequal bargaining power, but we nevertheless held in *Rodriguez de Quijas* and *McMahon* that agreements to arbitrate in that context are enforceable." 500 U.S. at 33 (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) and *McMahon*, 482 U.S. at 230)). Neither the public policy considerations in the FCA, nor the inequality of bargaining power between the parties, is sufficient to show congressional intent to preclude arbitration.

### 2. *Coeur d'Alene Tribe*

Lozano next argues that, pursuant to our decision in *Coeur d'Alene Tribe*, FCA claims are not subject to mandatory arbitration. Although, in *Coeur d'Alene Tribe*, we discussed the limited fora for adjudication of FCA claims, we did not consider the appropriateness of arbitration as a possible forum.

**[5]** The issue in *Coeur d'Alene Tribe* was whether tribal courts had jurisdiction to adjudicate claims brought pursuant to the FCA. 295 F.3d at 904. Relying on section 207 of the FCA, we determined that the tribal court did not have jurisdiction to adjudicate these claims based on the plain language of section 207:

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

47 U.S.C. § 207. In *Coeur d'Alene Tribe*, we held that, by restricting jurisdiction to the FCC and the federal district court, Congress intended to leave no room for "adjudication in any other forum — be it state, tribal, or otherwise." 295 F.3d at 905. Lozano argues that the arbitral forum is therefore precluded.

**[6]** In *Coeur d'Alene Tribe,* this court did not determine whether the same statutory language barred the arbitral forum, which as stated above, requires that we find a strong showing of congressional intent. We do not. The fact that Congress drafted the amendments to the FCA to include the designation of fora for the adjudication of its claims, without more, does not establish congressional intent. For example, the jurisdictional language for suits pursuant to the Sherman Act, 15 U.S.C. § 1, *et seq.*, has similar language to the FCA. *Compare* 47 U.S.C. § 207 (FCA) ("may bring suit . . . in any district court of the United States of competent jurisdiction") *with* 15 U.S.C. § 15(a) (Sherman Act) ("may sue therefor in any district court of the United States"). Faced with this similar language, the Court in *Mitsubishi* held that claims under the Sherman Act are subject to arbitration. 473 U.S. at 640. We likewise hold that FCA claims may be subject to agreements to arbitrate.

## B.   Differing State Laws on Class Action Waivers

Lozano next contends that the district court abused its discretion by going beyond the factors enumerated in Rule

23(b)(3) and seizing on AWS's premature argument that if a class is certified, and it seeks to compel arbitration, predominance is defeated. Lozano argues that the district court erred in resting its finding of predominance of individual issues on speculation as to AWS's future litigation strategy. In the alternative, Lozano contends that determining whether the class action waiver in this case is unconscionable for all fifty states is not impractical and should not destroy predominance.

**[7]** The district court properly considered the effect of AWS's intent to seek to arbitrate the class action claims. As discussed above, while the district court found the class action waiver to be unconscionable under California law, it also recognized that the waiver may not be unconscionable under other states' laws. The district court therefore determined that predominance was defeated because AWS's intent to seek arbitration of the class would necessitate a state-by-state review of contract conscionability jurisprudence. While Lozano argues that the district court's analysis of AWS's future intent was an abuse of discretion, we find the district court's practical consideration of future events reasonable. In fact, in *In re Hotel Telephone Charges*, this court expressed dissatisfaction over the district court's unwillingness to address the impact of future individual questions in its analysis of predominance. 500 F.2d 86, 90 (9th Cir. 1974) ("However difficult it may have been for the District Court to decide whether common questions predominate over individual questions, it should not have sidestepped this preliminary requirement of the Rule by merely stating that the problem of individual questions 'lies far beyond the horizon in the realm of speculation.' "). Moreover, the law on predominance requires the district court to consider variations in state law when a class action involves multiple jurisdictions. *Id.* In *Blackie v. Barrack*, for example, we held that the trial court properly considered the "future course of the litigation" in determining whether class certification was appropriate. 524 F.2d 891, 900-01 (9th Cir. 1975) ("[T]he district judge is necessarily bound to some degree of speculation by the uncertain

state of the record on which he must rule.") (citations and quotations omitted).

**[8]** Furthermore, the fact that AWS intended to compel arbitration was not speculative. By the time the district court decided Lozano's class certification motion, AWS had already moved to compel arbitration of Lozano's claims, and appealed the district court's denial of that motion. Finally, with respect to his second claim of error, that the district court should have determined whether the class action waiver in this case would be enforceable for each state, we note that Lozano offers no explanation of how the district court was to conduct this analysis and how practical such analysis would be in this context. Thus, although he suggests that the district court should be required to engage in this analysis, he makes no attempt to do so himself. Nevertheless, we reject the notion that the district court was obligated to conduct a comprehensive survey of every state's law on this issue.

**[9]** Based on our conclusion that the district court did not abuse its discretion in considering AWS's intent to move to compel arbitration of the class, and that it was not required to conduct a state-by-state analysis of this issue, we find that the district court did not abuse its discretion by declining to certify a class on this basis.

## C. DJA Claim

Lozano also claims the district court erred when it held that Lozano's DJA claim could not be certified as a class because it was "parasitic" of Lozano's FCA claim. Although the district court did not specifically articulate its decision regarding class certification of the DJA claim, its ultimate conclusion is sound. If the certification of a potential nationwide class would require a state-by-state legal analysis of the arbitration agreement, and its accompanying class action waiver, then the same predominance analysis applies with equal force to preclude Lozano's DJA claim. Lozano does not contend that his

DJA claim is exempt from the arbitration agreement, or that his DJA claim requires a separate analysis. Lozano simply, and unconvincingly, contends that the district court failed to articulate its reasoning for denying class certification of the DJA claim. Counsel for Lozano conceded as much at oral argument, agreeing that the DJA claim is "parasitic" of the FCA claim, but requested a separate analysis of the claim under Rule 23(b)(2). As discussed infra, however, we find that the district court did not abuse its discretion in declining to certify a class under Rule 23(b)(2) for Lozano's FCA claims.

### 1.  Rule 23(b)(2) Injunctive Relief

**[10]** Lozano argues that the district court failed to address his request for Rule 23(b)(2) injunctive relief. This is incorrect. The district court addressed Lozano's request for injunctive relief pursuant to Rule 23(b)(2) and held that, based on the type of relief requested by Lozano in his Second Amended Complaint, Lozano was seeking primarily monetary damages, which defeats class certification under Rule 23(b)(2). *See In re Paxil Litig.*, 218 F.R.D. 242, 247 (C.D. Cal. 2003) (finding a proposed class that is aimed at obtaining monetary relief to be inappropriate for certification under Rule 23(b)(2)); *see also Molski v. Gleich*, 318 F.3d 937, 950 (9th Cir. 2003) (focusing on the intent of the plaintiffs in bringing the suit). Here, the district court determined that Lozano sought primarily monetary damages, and thus, Rule 23(b)(2) certification was not appropriate. Indeed, even on appeal, Lozano does not contend that he is seeking primarily injunctive relief. Because the district court did not abuse its discretion in declining to certify a class pursuant to this provision, we affirm.

### 2.  California Subclass for FCA and DJA Claims

At a minimum, Lozano claims that the district court should have considered certifying a California subclass for his FCA and DJA claims. Lozano contends that a smaller California

class would not be barred by issues of predominance. Lozano never requested that the district court consider a California subclass for these claims. Importantly, in requesting certification, Lozano distinguished his breach of contract claim by requesting that a nationwide Class, or alternatively, a California Subclass, be certified on this claim. Lozano did not make a similar, alternative request with respect to the FCA and DJA claim.

[11] The district court did not err in failing to consider whether Lozano could bring his FCA and DJA claims as part of the California Subclass because Lozano never requested it. *See Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 988 (9th Cir. 2005); *Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 329 (D.C. Cir. 2004) (holding that its decision rests on its "well-established discretion not to consider claims that litigants fail to raise sufficiently below and on which district courts do not pass"); *see also Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001) (holding that plaintiff bears the burden of constructing and proposing subclass, not the district court) (quotations and citations omitted). We therefore reject Lozano's appeal on this issue.

## D. CLRA Claim

[12] The CLRA makes it unlawful to use "unfair methods of competition and unfair or deceptive acts or practices" in the sale of goods or services to a consumer. Cal. Civ. Code § 1770. The district court certified a class action based on AWS's inclusion of an unconscionable class action waiver in an arbitration agreement pursuant to section 1770(a)(19) of the CLRA ("subsection (a)(19)"). *Id.* at § 1770(a)(19) (stating that the inclusion of an unconscionable provision in a contract is an unlawful business practice). The district court certified this class pursuant to a theory that was neither pled, nor properly considered by the district court when granting class certification. Accordingly, we reverse this district court's order certifying a California class for Lozano's CLRA claim.

**[13]** In his complaint, Lozano asserts allegations under subsection (a)(19), but none relate to class action waivers. Instead, Lozano alleges that "[b]y engaging in the practice of out-of-cycle billing while making inadequate and incomplete disclosures to consumers . . . Defendants have violated, and continue to violate, the CLRA in at least the following respects: . . . (d) in violation of section 1770(a)(19) of the CLRA, Defendants have inserted an unconscionable provision in a contract." Thus, there is little doubt that Lozano's subsection (a)(19) claim, as originally pled, was tied entirely to AWS's failure to adequately disclose its *billing practices* and not the class action waivers. After the district court held AWS's class action waiver to be unconscionable pursuant to *Ting* and *Ingle*, however, Lozano argued that his subsection (a)(19) claim included the unconscionable class action waiver.

**[14]** The district court rigorously analyzed the Rule 23(a) factors in considering whether to certify a class based on AWS's practice of out-of-cycle billing and its disclosures relating to this practice. The district court did not analyze Lozano's CLRA claim based on the unconscionability of the class action waiver against any of the four prerequisites for class action litigation: numerosity, commonality, typicality, and adequacy of representation. *See Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003). The only class action factor the court considered was whether Rule 23(b)(3)'s predominance of class issues was satisfied. Because a class may be certified only if the district court is satisfied "after a rigorous analysis" that the prerequisites of Rule 23(a) have been met, we reverse the district court's decision to certify a class action based on the unconscionability of AWS's class action waiver. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005) (citing *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982)).

The district court's failure to analyze the Rule 23(a) factors in determining whether to grant class certification based on Lozano's unconscionability claim also resulted in its certify-

ing a theory with no definable class. As stated above, the district court adopted a class definition for the California Subclass based solely on out-of-cycle billing.

[15] The class the district court certified under subsection (a)(19) is wholly unrelated to this definition. Any class certified under subsection (a)(19) necessitates a class definition that includes individuals who sought to bring class actions in California, but were precluded from doing so because of the class action waiver in AWS's arbitration agreement, and suffered some resulting damage. *See Wilens v. TD Waterhouse Group, Inc.*, 15 Cal. Rptr. 3d 271, 276-77 (Cal. Ct. App. 2003) (holding a court may not presume damages based on the mere insertion of an unconscionable clause in a contract). The new class would be unrecognizable from the class definition adopted by the district court. The district court's failure to analyze Lozano's section (a)(19) claim, and resulting failure to identify a class based on a violation of this section, was manifest error. Accordingly, based on all the above reasons, we reverse the district court on this issue.[7]

## E. UCL Claim

The district court granted class certification for Lozano's UCL claim based on his theory that AWS's written disclosures were inadequate to inform AWS customers about the possibility of out-of-cycle billing. AWS claims the district court erred by granting Lozano's motion for class certification for his UCL claim because (1) Lozano has no damages and therefore lacks standing; (2) Lozano's damages, if any, are not typical of the class; and (3) individual issues predominate over class issues.

---

[7]The district court also certified a class pursuant to the UCL based solely on Lozano's claim that AWS violated the CLRA. The above analysis applies with equal force to the district court's certification of the derivative UCL claim.

**[16]** The UCL is a broad remedial statute that permits an individual to challenge wrongful business conduct "in whatever context such activity might occur." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.*, 83 Cal. Rptr. 2d 548, 561 (1999) (citation omitted). It prohibits "unfair competition," which it broadly defined as including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." Cal. Bus. & Prof. Code § 17200. Because the statute is written in the disjunctive, it is violated where a defendant's act or practice is (1) unlawful, (2) unfair, (3) fraudulent, or (4) in violation of section 17500 (false or misleading advertisements). *Cel-Tech*, 83 Cal. Rptr. 2d at 565. Each prong of the UCL is a separate and distinct theory of liability; thus, the "unfair" practices prong offers an independent basis for relief. *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 316-317 (Cal. Ct. App. 1999) (citation and quotation omitted). Lozano asserts that AWS's conduct was "unfair" because it did not fully and adequately disclose its billing practices at the time customers contracted with it to obtain cellular services.

### 1. Standing

AWS argues that Lozano lacks standing under the UCL because he suffered no damages from out-of-cycle billing. When Lozano filed this action, any person could assert a UCL claim on behalf of the general public regardless of whether they suffered an actual injury. Cal. Bus. & Prof. Code § 17204 (2003). Thus, as originally drafted, the UCL gave any person authority to assert a UCL claim on behalf of the public as a private attorney general. In 2001, Lozano filed this putative class action both as a private attorney general and as an injured plaintiff.

After filing this lawsuit, but before the district court granted class certification, the voters of California enacted Proposition 64, which eliminated private attorney general standing for UCL claims. Cal. Bus. & Prof. Code § 17204. After Proposi-

tion 64, a person asserting an unfair competition claim must allege that (1) he or she "suffered injury in fact," and (2) "lost money or property as a result of such unfair competition." *Id.* While Proposition 64 did not expressly declare that the new standing requirements applied to cases pending at the time of its enactment, in July 2006, the California Supreme Court answered the question in the affirmative. *See Californians for Disability Rights v. Mervyn's, LLC*, 46 Cal. Rptr. 3d 57, 64 (Cal. 2006) ("For a lawsuit properly to be allowed to continue standing must exist at all times until judgment is entered and not just on the date the complaint is filed.").

The district court did not consider Lozano's standing as a private attorney general, but focused instead on whether his claimed injuries were such that he had standing to bring a UCL claim as an injured plaintiff. The district court, incorporating its findings from its summary judgment order, found that Lozano had sufficient evidence of actual injury as a result of AWS's inadequate disclosures — the reimbursement of which the district found to be an attempt to avoid suit — together with an injury it termed the "reservation" injury. Thus, we must determine whether the type of injury articulated by the district court is sufficient to establish Lozano's standing pursuant to section 17204, as amended by Proposition 64.

The parties do not dispute that Lozano suffered pecuniary loss as a result of his alleged unawareness of AWS's out-of-cycle billing practices. Shortly after contracting with AWS for cellular service, Lozano received an invoice stating that he had been charged fees as a result of out-of-cycle minutes from his previous invoice. The record also supports a finding that, during the course of his contract with AWS, AWS would occasionally charge Lozano an overage fee based on out-of-cycle billing. AWS contends, however, that these charges were offset by the benefits Lozano received from out-of-cycle billing. In considering these claims of error, we must address the effect of AWS's reimbursement to Lozano for his out-of-

cycle charges prior to his filing suit, and the effect of the claimed offset of benefits Lozano received during the same time.

With respect to the former issue regarding the effect of AWS's reimbursement prior to suit, the district court found that AWS reimbursed Lozano only after realizing that Lozano "was instigating legal proceedings" against it. Based on this factual finding, which we review for clear error, the district court concluded that it was not divested of its power to hear the case. In so concluding, the district court relied on *United States v. W.T. Grant*, where the Supreme Court held that "the voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case," unless there is no reasonable expectation that the wrong will be repeated; otherwise, the "defendant is free to return to his old ways." 345 U.S. 629, 632 (1953) (citations and quotations omitted); *see also DeFunis v. Odegaard*, 416 U.S. 312, 318 (1974). The district court found that it did not need to speculate as to whether AWS would return "to its old ways" because AWS's position was that its practice of out-of-cycle billing was legal and adequately disclosed to its customers.

While we agree with the district court's ultimate decision regarding the justiciability of Lozano's claim, we analyze the claim differently to address issue of both standing and mootness. As stated above, the district court relied on *W.T. Grant* and *DeFunis* to support its finding that Lozano's injuries, capable of being repeated, were justiciable. Both cases are based on mootness, i.e., plaintiff had standing when he or she filed suit but due to a changed circumstance his or her claim became moot. Here, AWS argues that Lozano did not have standing to bring this action in the first instance. While some courts have characterized mootness simply as "the doctrine of standing set in a time frame," *see Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997), a careful analysis should distinguish the two doctrines.

In determining mootness, the *defendant* bears the burden of showing that its voluntary compliance moots a case by convincing the court that "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190 (citation omitted). By contrast, in determining standing issues the court considers whether the *plaintiff* has demonstrated that, "if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the threatened injury is certainly impending." *Id.* (internal quotation marks and citations omitted). Thus, Lozano bears the initial affirmative burden of showing that AWS's conduct is likely to continue and that the threatened injury is certainly impending. Conversely, to establish mootness, AWS must convince the court that its conduct is not reasonably expected to recur.

[17] Based on the facts before us, we find that Lozano, when faced with the realistic threat that AWS would continue to charge him for out-of-cycle calls, had standing to bring this claim. Likewise, there is nothing in the record that supports a finding that Lozano's claim is now moot. We base our decision on the following: (1) Lozano continues to be a customer of AWS's cellular service, subject to AWS's out-of-cycle billing practices; (2) after this suit was filed, Lozano suffered another overage charge as a result of out-of-cycle billing;[8] and (3) if the disclosures were inadequate, then Lozano may show that as a result of the inadequacies of the disclosures, he did not receive the full benefit of his contract with AWS. This latter injury is what the district court defined as the "reservation" injury. That is, Lozano contracted for 400 free "anytime" minutes. Yet, due to out-cycle-billing, he reserved, and therefore lost, a certain number of those minutes each billing period to account for the late-billed roaming calls.

---

[8]Whether this overage charge was offset by benefits Lozano received as a result of out-of-cycle billing is a determination better left to a fact-finder during the merits portion of the lawsuit.

**[18]** The next question we address is whether these injuries are recoverable under the UCL. The only types of relief available under the UCL actions are injunctive and restorative. Cal. Bus. & Prof. Code § 17203; *see also Cel-Tech*, 83 Cal. Rptr. 2d at 560. While restoring Lozano's overage payments, if any, fits squarely within the restorative context of the UCL, we question whether restoring Lozano's "reserved" minutes falls into this category. Restitution in the UCL context, however, includes restoring money or property that was not necessarily in the plaintiff's possession. The California Supreme Court has "stated that the concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person. Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *See Juarez v. Arcadia Fin., Ltd.*, 61 Cal. Rptr. 3d 382, 400 (Cal. Ct. App. 2007) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 131 Cal. Rptr. 2d 29, 42 (2003)). Here, Lozano has a vested interest in 400 free anytime minutes. Due to out-of-cycle billing, however, Lozano found it necessary to reserve, and therefore lose, a certain number of those minutes each billing period. Accordingly, we find that Lozano has properly stated an injury that he did not receive the full value of his contract with AWS due to its alleged failure to disclose out-of-cycle billing, and that this injury is redressable under the UCL. *See Daghlian v. DeVry Univ., Inc.*, 461 F. Supp. 2d 1121, 1155 (C.D. Cal. 2006) (accepting plaintiff's theory that he suffered injury under the UCL because he paid thousands of dollars of tuition to defendant university and "did not receive what he had bargained for" due to its alleged unfair business practices).

### 2. Typicality

AWS next contends that, even if Lozano could show injury, his injury is not typical of the class, and he therefore is an inadequate class representative. AWS bases its contentions on the fact that Lozano was reimbursed for his out-of-cycle bill-

ing charges, he benefitted overall from out-of-cycle billing over the course of his contract with AWS, and his claimed damages for "reserving" minutes is unique to him.

Under Rule 23(a)(3), it is not necessary that all class members suffer the same injury as the class representative. *See Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 488 n.8 (C.D. Cal. 2006) (citing *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992) (further citations omitted)); *see also Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005) ("In determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff.") (quoting *Rosario*, 963 F.2d at 1018).

**[19]** We agree with the district court that Lozano's injuries are typical of the class. The class definition includes all California customers that AWS charged for calls made during a billing period other than the billing period in which the calls were made. Given AWS's policy of offering a one-time reimbursement to customers who complain when they receive an invoice containing charges for out-of-cycle calls, along with an explanation of out-of-cycle billing, it does not strain the parameters of typicality to presume that many of these customers will thereafter reserve minutes to account for AWS's billing practice. Thus, the class is likely to include customers who were charged for overage fees, as well as customers who, after learning of out-of-cycle billing, reserved their minutes. We therefore do not find that the district court erred in holding Lozano's claims typical of the class.

3. Predominance of Common Issues

AWS argues that because all of Lozano's claims involve some proof of individual knowledge and expectations, all should fail under Rule 23(b)(3) because individual issues would necessarily predominate over common issues. The district court itself found that individual issues predominated in

Lozano's breach of contract and CLRA claims, but found that common issues predominated in the UCL claim.

In its order on class certification, the district court found that Lozano's breach of contract and CLRA claims required an individualized analysis of awareness and knowledge of AWS's out-of-cycle billing practices, such that the predominance prong of Rule 23(b)(3) was not met. AWS now argues that the district court's finding, that predominance was not fatal to class certification of Lozano's UCL claim, is inconsistent with its findings with respect to the breach of contract and CLRA claims. First, we examine the basis of the district court's decisions not to certify on those claims and then turn to considering how the UCL claim does, or does not, differ.

Though Lozano requested certification on four separate theories under the CLRA, the district court denied certification on the first three theories, which were based on fraudulent or misleading representations, and granted certification on the fourth, relating to insertion of an unconscionable arbitration clause. In denying certification on the first three theories, the district court relied on the analysis of "materiality" in *Caro v. Proctor & Gamble*, 22 Cal. Rptr. 2d 419 (Cal. Ct. App. 1993). There, the California Court of Appeals concluded that individual issues predominated in the plaintiff's CLRA class action based on orange juice labeling. *Id.* at 432-33. Because the CLRA requires that any misrepresentations be material, the court found that it would have to determine whether each customer in the class thought the orange juice was "fresh" as advertised, or whether the customer had read the side of the carton disclosing that the juice came from concentrate. *Id.* Similarly, the district court in this case found that it would have to conduct an individualized review as to each class member's awareness and knowledge of out-of-cycle billing and AWS's disclosures to determine whether its representations were material under the CLRA.

With respect to Lozano's breach of contract claim, the district court held that it would have to ascertain each individu-

al's expectations about the contract, and determine whether those expectations were reasonable. Thus, the district court found that individual issues predominated over the class issues with respect to Lozano's breach of contract claim. The district court specifically noted, however, that its decision would be different had Lozano based his contract claim on a theory about the uniformity of AWS's disclosures about out-of-cycle billing, rather than about reasonable expectations.

The legal analysis required under the UCL resembles, but remains distinct from, both the CLRA's materiality inquiry and the common law's emphasis on reasonable expectations. Construing Lozano's theory to be based on AWS's uniform written disclosures to its customers, the district court considered the weight individualized proof would play under the test prescribed by *South Bay*. This test involves balancing the harm to the consumer against the utility of the defendant's practice. *See South Bay*, 85 Cal. Rptr. 2d at 315. The district court held that "the possibility of some slightly different individual circumstances" would not destroy the predominance of common issues in light of the legal standard. AWS argues that the district court erred because the UCL in fact does require consideration of individual issues.

California's unfair competition law, as it applies to consumer suits, is currently in flux. In 1999, the California Supreme Court rejected the balancing test in *South Bay* in suits involving unfairness to the defendant's competitors. *See Cel-Tech*, 83 Cal. Rptr. 2d 548. The court held that this balancing test was "too amorphous" and "provide[d] too little guidance to courts and businesses." *Id.* at 567. The court then held that unfairness must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Id.* at 565. This holding, however, was limited to actions based on unfairness to competitors. *Id.* at n.12.

The California courts have not yet determined how to define "unfair" in the *consumer* action context after *Cel-Tech*.

In the First District Court of Appeals, the court extended the *Cel-Tech* definition to consumer cases. *See Gregory v. Albertson's, Inc.,* 128 Cal. Rptr. 2d 389 (Cal. Ct. App. 2002). The Fourth District Court of Appeals initially proposed a test along the lines of *Cel-Tech* but later avoided the question by dismissing the claim under both the old and the new standard. *See Bardin v. Daimlerchrysler Corp.*, 39 Cal. Rptr. 3d 634, 636 (Cal. Ct. App. 2006); *Scripps Clinic v. Superior Court*, 134 Cal. Rptr. 2d 101 (Cal. Ct. App. 2003). The Second District Court of Appeals has issued two conflicting decisions, one applying the old balancing test, *see McKell v. Washington Mut., Inc.*, 49 Cal. Rptr. 3d 227, 238 (Cal. Ct. App. 2006), and another, issued during the same week, holding that *Cel-Tech* overruled all prior definitions of unfairness and created a new test, *see Camacho v. Automobile Club of Southern California*, 48 Cal. Rptr. 3d 770, 776 (Cal. Ct. App. 2006). In *Camacho*, the court chose to apply the three-pronged test contained in the Federal Trade Commission Act, 15 U.S.C. § 45(a). *See id.* at 776.

While we agree with the Fourth District that *Cel-Tech* effectively rejects the balancing approach, we do not agree that the FTC test is appropriate in this circumstance. Though the California Supreme Court did reference FTC's section 5 as a source of "guidance," that discussion clearly revolves around anti-competitive conduct, rather than anti-consumer conduct. *See Cel-Tech*, 83 Cal. Rptr. 2d at 565 ("As the issue before us in this case arises out of a claim of unfair competition between direct competitors, the relevant jurisprudence would be that arising under section 5's prohibition against "unfair methods of competition."). Accordingly, we decline to apply the FTC standard in the absence of a clear holding from the California Supreme Court.

[20] The remaining options, then, are to apply *Cel-Tech* directly to this case and require that the unfairness be tied to a "legislatively declared" policy, *see Scripps Clinic*, 134 Cal. Rptr. 2d 101, or to adhere to the former balancing test under

*South Bay*. These options, however, are not mutually exclusive. In *Schnall v. Hertz Corp.*, 93 Cal. Rptr. 2d 439 (Cal. Ct. App. 2000), the appellate court in the First District reversed the dismissal of a complaint in an unfair competition case where the alleged unfairness was *both* tethered to a legislatively declared policy *and* the plaintiff could prove facts showing that the harm was not outweighed by the utility. Because adopting one standard does not necessitate rejection of the other, we hold that, no matter the status of *Cel-Tech*, the district court did not apply the wrong legal standard by relying on the balancing test from *South Bay*. In the absence of further clarification by the California Supreme Court, we endorse the district court's approach to the law as if it still contained a balancing test.

AWS argues that, under *South Bay*, though, individualized circumstances matter in the determination of whether a practice is unfair. We agree that evidence about individual knowledge and expectations may help the court determine the extent of the harm for the purposes of the UCL's balancing test. In *South Bay*, the appellate court rejected a car dealership's claim that the manufacturer's financing arm used an unfair method of calculating interest. The court found that "substantial evidence indicated South Bay entered into the disputed loan agreements knowing, understanding, agreeing and expecting that GMAC would use the [allegedly unfair] method to calculate interest." *See South Bay*, 85 Cal. Rptr. at 316. Based on this record, and in light of the fact that this method was widely used and even expected in contracts with other dealerships, the court found that practice was not unfair as to South Bay Chevrolet itself.

**[21]** The district court in this case took individual circumstances into account but ultimately determined that *South Bay* was distinguishable. The district court found that Lozano's claim was based on uniform disclosures made by AWS to all its consumers, whereas the disclosures in *South Bay* varied from dealer to dealer. Therefore, the individual circumstances

regarding how these disclosures were read or received would not destroy predominance, in the district court's view. Though we might have decided the issue differently, our review is "limited to assuring that the district court's determination has a basis in reason." *Gonzales v. Free Speech Coalition*, 408 F.3d 613, 618 (9th Cir. 2005) (citation omitted). The district court gave full consideration to AWS's argument and did not abuse its discretion in determining that individual circumstances would not defeat the predominance of common issues. We accordingly affirm its certification of the class.

**[22]** Finally, we find no basis for AWS's contention that the district court failed to consider the effect of affirmative defenses on class treatment. Our review of the district court's order reveals that it properly considered each of AWS's defenses in determining whether to certify a class.

## CONCLUSION

We reverse the district court's order granting class certification of Lozano's CLRA claim based on the inclusion of an unconscionable clause in the agreement. Similarly, we reverse the district court's certification of Lozano's UCL claim based on unlawful conduct, as it is dependent on Lozano's CLRA claim. We otherwise affirm the district court's order on class certification. Each party shall bear its own costs on appeal. *See* Fed. R. App. P. 39(a)(4)

**AFFIRMED in part, REVERSED in part.**