ESTATE OF Robert S. FELTS, Plaintiff,

v.

GENWORTH LIFE INSURANCE COMPANY, et al.,
Defendants.

No. C06–1419RAJ.

United States District Court,
W.D. Washington,
at Seattle.

April 14, 2008.

**514**

Richard Lawrence Martens, Steven A. Stolle, Martens + Associates PS, Seattle, WA, Barbara L. Bollero, Gulliford McGaughey & Dunlap, Bellevue, WA, for Plaintiff.

Darya Swingle, Stephen M. Rummage, Darcy W. Shearer, Davis Wright Tremaine, Mark David Roth, Patrick L. Hinton, Golbeck Roth PLLC, Stephen M. Rummage, Darcy W. Shearer, Davis Wright Tremaine, Seattle, WA, for Defendants.

ORDER

RICHARD A. JONES, District Judge.

## I. INTRODUCTION

This matter comes before the court on Plaintiff's motion to certify a class to pursue claims against Defendants (Dkt. # 72) and three motions seeking related relief (Dkt. ## 61, 78, 96). The court has considered the parties' briefing and supporting evidence, and has heard from the parties at oral argument. For the reasons stated below, the court DENIES the motion to certify a class (Dkt. # 72) and GRANTS and DENIES the remaining motions as stated at the conclusion of this order.

## II. BACKGROUND

Life insurance, like all insurance, is a gamble. Typically, a person's concern that her life will end unexpectedly prompts her to purchase a life insurance policy to provide resources for her family or others after her death. She exchanges a premium, or periodic premiums, for a lump sum payout upon death. The insurance company gambles too, pricing the policy based on its best estimate of when the person's life will end. If the insured is long-lived, her gamble will not pay off, whereas the insurer's gamble will.

A person who prefers to reverse the life insurance gamble can purchase a life-only single premium immediate annuity ("LOSPIA"). To obtain a LOSPIA, an annuitant pays a substantial premium up front in exchange for periodic payments for the remainder of her life. A LOSPIA pays nothing after the annuitant's death. Other single premium annuity products, which are not at issue in this case, provide for partial premium refunds at death, or extend payments for a fixed term after the annuitant's death. Unlike a traditional life insurance policy, a LOSPIA pays off for the annuitant if she

lives longer than expected, because the total payout under the policy can eventually exceed the up-front premium.

If his insurance purchases are any indication, Robert Felts, whose estate ("the Estate") is the Plaintiff in this action, believed he would live for a long time. He purchased LOSPIAs and other annuities repeatedly. He purchased several LOSPIAs from Defendant Genworth Life Insurance Company ("Genworth"). In particular, he purchased at least five Genworth LOSPIAs between 2001 and 2003, when he was between 91 and 93 years old. Mr. Felts died in August 2004, when he was 94 years old, at which time it is undisputed that the payments he had received on the Genworth LOSPIAs had not exceeded the up-front premiums he paid.

The Estate seeks damages against Genworth and two people who sold Genworth LOSPIAs to Mr. Felts. The Estate claims that Genworth misrepresented the risks inherent in the purchase of its LOSPIAs, misrepresented or failed to disclose facts that would have been material to Mr. Felts in deciding to purchase the LOSPIAs, and failed to properly determine whether a LOSPIA was an appropriate investment option for Mr. Felts.

The Estate also seeks to represent four classes and subclasses of Genworth LOSPIA purchasers. Collectively, the four classes would include all persons in the United States, living and dead, who purchased Genworth LOSPIAs after June 30, 2000, when they were 85 or older.[1] The Estate brings no claims under federal law. Instead, it brings two contract-based claims, a claim for negligence, a claim for negligent or intentional misrepresentation, two claims arising under state consumer protection laws, a claim under Washington's criminal profiteering act, and a claim for declaratory and injunctive relief.[2] The court reserves a detailed discussion of these claims until after a discussion of the legal standards applicable to the Estate's class certification motion.

## III. ANALYSIS

### A. Class Certification Standards

The court's decision to certify a class is discretionary. *Dukes v. Wal–Mart, Inc.*, 509 F.3d 1168, 1175 (9th Cir.2007). In considering certification, the court must apply each of the applicable requirements of Fed.R.Civ.P. 23 ("Rule 23"). *Id.* at 1176. The court must engage in a "rigorous analysis," but a "rigorous analysis does not always result in a lengthy explanation or in-depth review of the record." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir.2005) (citing *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

A plaintiff bears the burden of demonstrating that the class she proposes to represent meets the Rule 23 requirements. *Dukes*, 509 F.3d at 1177. Rule 23(a) requires a plaintiff to demonstrate that the proposed class is sufficiently numerous, that it presents common issues of fact or law, that it will be led by one or more class representatives with claims typical of the class, and that the class representative will adequately represent the class. *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364. If the plaintiff satisfies the Rule 23(a) requirements, she must also show that the proposed class action meets one of the three requirements of Rule 23(b). *Dukes*, 509 F.3d at 1176 (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001)).

In determining whether the proposed class satisfies Rule 23, the court is neither permitted nor required to conduct a "preliminary inquiry into the merits" of the Estate's claims. *Blackie v. Barrack*, 524 F.2d 891,

---

1. The four classes and subclasses are (1) a nationwide class of all living persons who purchased a Genworth LOSPIA after June 30, 2000 and were 85 or older at the time of purchase, (2) a subclass of all Washington residents meeting the same conditions, (3) a nationwide class of all estates whose decedents met the same conditions, and (4) a subclass of all Washington estates who met the same conditions. Pltf.'s 3d Amend. Compl. at 3. The Estate initially sought to include beneficiaries of those estates as class members, but now concedes that prior rulings of the court foreclose this option. Pltf.'s Reply at 11.

2. Despite the Estate's written assertion that some of its claims are "individual non-class claims of the Estate," Pltf.'s Reply at 12, counsel for the Estate stated at oral argument that it is pursuing every claim on behalf of all class members.

901 (9th Cir.1975) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)); *see also* Fed.R.Civ.P. 23 advisory committee's note (2003) ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision"). As long as the court has "sufficient material before [it] to determine the nature of the allegations, and rule on compliance with [the] requirements [of Rule 23], and [it] bases [its] ruling on that material, [its] approach cannot be faulted because plaintiffs' proof may fail at trial." *Blackie,* 524 F.2d at 901. The court may assume the truth of a plaintiff's substantive allegations, *id.* at 901 n. 17, but must engage in fact finding to determine whether a plaintiff has satisfied the requirements of Rule 23. *See Dukes,* 509 F.3d at 1175 ("[T]he district court's factual findings as to the applicability of Rule 23 criteria are entitled to the traditional deference given to such determinations.").

With these guidelines in mind, the court turns to the Estate's allegations and the evidence before the court.

**B. Overview of the Proposed Classes**

**1. Mr. Felts and His Purchases of Genworth LOSPIAs**

The court begins with the Estate's allegations regarding Mr. Felts' purchases of Genworth LOSPIAs. Mr. Felts purchased at least five LOSPIAs from Genworth between August 2001 and June 2003, paying more than $155,000 in premiums. Pltf.'s 3d Amend. Compl. at 13. He had received just over $66,000 in monthly payments from Genworth when he died. *Id.* It is undisputed that Mr. Felts was a frequent purchaser of annuities of many kinds, and from many providers other than Genworth. *See, e.g.,* Stolle Decl., Ex. O (including a table of Mr. Felts' annuity purchases). Mr. Felts borrowed money to purchase annuities, and used payments from his annuities to finance the purchase of additional annuities. As the court will discuss in greater detail in Part III.C.3, *infra,* Mr. Felts had worked in the life insurance industry, and held himself out as having specialized knowledge regarding insurance and annuity products.

Mr. Felts purchased his Genworth LOSPI-As from Defendants Hersh Stern and Jeffrey Reese. Mr. Stern is a salesman who sells annuities through his website, www. immediateannuities.com. He is an independent contractor, not a Genworth employee. Stolle Decl., Ex. C (Stern Depo. at 223). Mr. Stern lives in New Jersey. Other than a brief meeting at an airport in 1996, Mr. Stern transacted his business with Mr. Felts either on the phone or by mail. Stolle Decl., Ex. C (Stern Depo. at 11–13, 49–51). Mr. Stern does not directly solicit business from any customer. Instead, he relies on customers to contact him. Stern Decl. ¶ 12; Stolle Decl., Ex. C (Stern Depo. at 11–13). He sells at least 10 different annuity products, and describes each on his website and in "Annuity Shopper," a newsletter he sends to existing customers and prospective customers who request it. Stolle Decl., Ex. C (Stern Depo. at 80–81). He does not recommend any particular annuity product. Stolle Decl., Ex. C (Stern Depo. at 80–81). He is not a "financial planner," and he did not recommend any product or financial plan to Mr. Felts. Stolle Decl., Ex. C (Stern Depo. at 87–88, 164–65). By the time Mr. Stern sold Mr. Felts his first Genworth LOSPIA in August 2001, he had already sold Mr. Felts 58 annuities between March 1994 and May 2001, including at least five LOSPIAs from other providers. Stolle Decl., Ex. O (table of purchases).

Mr. Reese was formerly a representative in Genworth's in-house sales division. Only five employees work in this division. Layton Decl. ¶ 14. Genworth rarely sells annuities directly to its customers, but instead relies on a vast network of intermediaries. *Id.* at ¶¶ 4, 14 The in-house sales division services Genworth annuitants who have become "orphaned" from whoever sold them their annuities, and occasionally sells to customers who contact Genworth directly. Stolle Decl., Ex. B (Reese Depo. at 20–22). During his tenure at Genworth, Mr. Reese sold only "a couple" LOSPIAs, perhaps as few as two, one of which was to Mr. Felts. *Id.* (Reese Depo. at 68–69). Mr. Felts telephoned Genworth and was assigned randomly to Mr. Reese, who sold Mr. Felts a single LOSPIA. *Id.* Mr.

Reese never met Mr. Felts. *Id.* (Reese Depo. at 90–92).

## 2. Other Class Members and Their Purchases of Genworth LOSPIAs

In contrast to the relatively detailed evidence about Mr. Felts, the record reveals little about other potential class members' purchases of Genworth LOSPIAs. It appears that every person who buys a Genworth LOSPIA enters into an essentially identical Genworth-provided form contract. *See, e.g.*, Stolle Decl., Ex. I. At some point after entering the contract, all LOSPIA purchasers over the age of 85 are required to sign a Genworth "acknowledgment form" in the presence of a notary. *See, e.g.*, Layton Decl., Ex. G. One version of the acknowledgment form states, among other things, that the "annuity contract terminates on the date of the Annuitant's death," and that "[n]o further payment will be made thereafter." *Id.* at 67. Another version asked purchasers to acknowledge that "if you choose the Lifetime Income only payout, payments will continue for the life of the Annuitant(s) and will end upon the death of the Annuitant(s)." *Id.* at 69.

The Estate has provided no evidence about how any other class member purchased his or her Genworth LOSPIA. It is almost certain, however, that none of them purchased LOSPIAs from Mr. Reese, because, as noted above, he sold two LOSPIAs during his tenure at Genworth. According to unchallenged evidence, only 21 potential class members purchased Genworth LOSPIAs from Mr. Stern during the class period. Stern Decl. ¶ 18, Ex. F.[3]

Combining all proposed classes and subclasses, there are between 250 and 300 nationwide members of the proposed classes; about 17 of them reside in Washington.

Pltf.'s Mot. at 28; Stolle Decl., Ex. A (Layton Depo. at 128–29, 245–46).[4] More than 90% of the proposed class members did not purchase LOSPIAs from either Mr. Stern or Mr. Reese. There is little evidence regarding their LOSPIA purchases. As to any one of these class members, there is no evidence regarding who sold him a LOSPIA, what the salesperson told him, or what he asked of the salesperson. The evidence indicates that annuitants often have the assistance of family members, economic advisers, or estate planning attorneys in purchasing LOSPIAs. There is no evidence regarding whether any class member other than Mr. Felts sought out a LOSPIA, or whether a salesperson or other marketer directed them toward a LOSPIA. Other than the LOSPIA contract, the Genworth acknowledgment form, and a form letter that may accompany either the contract or the acknowledgment, there is no evidence regarding what documents any class member other than Mr. Felts saw in the course of purchasing a LOSPIA.

Rather than provide evidence revealing the purchasing experiences of other class members, the Estate relies on a laundry list of twelve objectionable practices. Pltf.'s Mot. at 4–5. These include failure to disclose or discuss mortality tables on which the LOSPIA pricing was based, failure to discuss other annuity products that might have been more suitable, misrepresentations about tax advantages and guaranteed payouts, failing to perform "suitability" analyses for each class member, not checking to determine if annuitants were using borrowed funds to purchase LOSPIAs, and failing to adhere to a set of voluntary ethical standards. With few exceptions, the Estate provides no evidence that would support the conclusion that class members other than Mr. Felts were subjected to such practices, and no evidence as to which of these practices might have

---

**3.** The 21 potential class members include 3 living Washingtonians, 9 living annuitants residing outside of Washington whose LOSPIA payouts have not yet exceeded their premiums, 2 Washington estates (one of which is Mr. Felts' estate), and 7 estates outside of Washington. Stern Decl. ¶ 18, Ex. F.

**4.** Genworth apparently has not reviewed its records to determine the size of the proposed

classes since July 2006. Stolle Decl., Ex. A (Layton Depo. at 128–29). Then, the classes had just over 250 members. *Id.* Based on the number of Genworth LOSPIAs sold each year, Genworth suggested at oral argument there are likely 300 class members now. The Estate offers no evidence suggesting a larger number of class members.

caused injury to any class member. This is a critical evidentiary gap, because the record shows that there are hundreds of LOSPIA salespeople working for hundreds of different employers, none of whom use uniform practices.

The record amply demonstrates that the class members purchased LOSPIAs from many different sources, almost none of whom were under Genworth's control. Genworth sells very few of its LOSPIAs directly, and instead relies on large financial institutions and independent insurance brokerages. Layton Decl. ¶ 4. Each of those entities, in turn, relies on a number of salespeople, who may be employees or independent contractors. *Id.* Other than requiring the use of its contracts, Genworth does not mandate particular sales procedures, does not require standard marketing practices, and does not control other entities' sales of its LOSPIA products. *Id.* Although Genworth develops some marketing materials, it does not mandate their use by any salesperson. *Id.* The Estate points to one Genworth nationwide advertising campaign (which targeted the elderly generally, but did not discuss LOSPIAs specifically), but that campaign did not begin until after Mr. Felts' death. Layton Decl. ¶ 18. There is no evidence that any class member saw any Genworth advertising, much less that the advertising influenced anyone's LOSPIA purchase.

### 3. Mr. Felts Compared to Other Class Members

Although there is little evidence regarding the circumstances under which other class members purchased their LOSPIAs, it is unlikely that their circumstances are comparable to Mr. Felts'. Mr. Felts was a former life insurance salesman. He held himself out to Mr. Stern as a licensed insurance agent. Stolle Decl., Ex. C (Stern Depo. at 113–15). It is a virtual certainty that Mr. Stern believed Mr. Felts' representations, because he gave 75% of his sales commission to Mr. Felts as a "professional courtesy to a fellow insurance agent." Stern Decl. ¶ 22. As noted above, Mr. Felts purchased dozens, if not hundreds, of annuity products from Mr. Stern and from others. In making those purchases, Mr. Felts often went out of his way to emphasize that he understood annuities generally, and particularly that he understood the nature of the LOSPIA transaction. For example, when Mr. Stern inquired about Mr. Felts' high volume of annuity purchases, Mr. Felts told him that he was writing a book about the subject. Stolle Decl., Ex. C (Stern Depo. at 92).

Moreover, when Genworth sent Mr. Felts LOSPIA acknowledgment forms, Mr. Felts took remarkable measures to let Genworth know that he understood the transaction. The forms required little more than checking a few boxes and providing a signature, but Mr. Felts was not satisfied with this minimal opportunity for feedback. On one acknowledgment form, he used a typewriter to add the following statement:

> THE ANNUITANT, ROBERT S. FELTS IS THE ALONE SURVIVOR OF HIS 63 YEAR MARRIAGE TO HIS WIFE WHO DIED LAST JAN 15TH 2002 A.D. MR. FELTS AT AGE 92½ IS FULLY AWARE OF WHAT HE IS BUYING AND DOING AFTER 65 NORMAL YEARS IN LIFE INSUR BUSINESS. NON REFUND IS DESIRED FOR HIMSELF ONLY.

Layton Decl., Ex. D ("Acknowledgment of Nonrefund Annuity" dated June 27, 2002).[5] In one letter, he explained that he disliked having to travel to a notary to perfect the LOSPIA acknowledgment forms:

> I AM AGE 92 IN ALL BUT PERFECT HEALTH.... I PLAY THE PIANO FOR SEVERAL OLD FOLKS HOME AS A HOBBY AND BURY THE BMONEY [sic] INTO S.P.I.A. ANNUITIES FOR MY LIFE. MY CHILDREN ARE FREE AND INDEPENDENT OF ME FINANCIALLY.... I DON'T NEED TO MAKE ANOTHER TRIP DOWNTOWN TO HAVE SOME 30 YEAR OLD BANK CLERK SIGN THIS LETTER. I KNOW WHAT I'M DOING AND HAVE BEEN DOING IT FOR OVER 65 YEARS.... I WANT A NON REFUND S.P.I.A. ON MY OWN LIFE ALONE

---

5. In quoting Mr. Felts' typewritten and handwritten correspondence and marginalia, the court has attempted to reproduce them as precisely, but has made some formatting changes.

AND NO ONE ELSE'S AND YOU OWE MY ESTATE NOTHING IF I DIE IN A COUPLE OF WEEKS AFTER YOU ISSUE THE CONTRACT.

Shearer Decl., Ex. D at 73 (June 21, 2002 letter). In a handwritten note to Genworth, he wrote as follows:

> Please issue Non Refund Life Annuity on me at age 92.... *Yes* I know a Non Refund leaves 0 to my estate. I've already bought my children off and out of estate.

*Id.* at 85 (underlining in original).

Indeed, even as to the few customers to whom Mr. Stern sold LOSPIAs, Mr. Felts was unique. He often reminded Mr. Stern of his superior experience. Stolle Decl., Ex. C (Stern Depo. at 87) ("He said, you young whippersnapper, you are half my age."). Mr. Felts, unlike Mr. Stern's other customers, took complete control. Stolle Decl., Ex. C (Stern Depo. at 95–96) ("Felts is in a class of his own.... We need to establish that. Because my process with Felts is different than with anybody else.").

With this evidentiary overview in mind, the court turns to the class certification inquiry.

### C. There Are, at a Minimum, Serious Questions Regarding the Estate's Ability to Satisfy the Requirements of Rule 23(a).

The court begins its inquiry with the numerosity, commonality, typicality and adequacy requirements of Rule 23(a). The court's examination of each requirement raises serious questions as to whether this action should proceed on behalf of any class. With a few exceptions, the court will not reach an ultimate conclusion as to whether Plaintiffs have satisfied the four requirements, reserving those conclusions for its analysis of Rule 23(b). *See Zinser*, 253 F.3d at 1186 n. 1 (affirming denial of class certification for failure to satisfy Rule 23(b) without reaching Rule 23(a) determinations).

### 1. There Are Serious Questions About Whether the Proposed Classes and Subclasses Are Sufficiently Numerous.

■ To satisfy the numerosity requirement of Rule 23(a)(1), the Estate must show that the proposed class "is so numerous that joinder of all members is impracticable." Often, the number of class members by itself is sufficient to establish the impracticability of joining them as plaintiffs. *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir.1982), *vacated on other grounds by* 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). Where the sheer size of the proposed class does not establish impracticality, the court should consider other factors, including "the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive or declaratory relief is sought." *Id.*

The Estate's evidence that, in aggregate, its proposed classes and subclasses contain approximately 300 members dispersed across the nation is much less compelling than it appears on its face. First, a significant portion of the proposed class will almost certainly decline to participate. *See* Fed.R.Civ.P. 23(c)(2)(B)(v)-(vi) (requiring notification of class member's right to opt out of class). A substantial portion of class members have collected payments from their LOSPIAs that exceed or nearly exceed the premium they paid.[6] The court presumes that purchasers would eschew participation in a class that sought to void their LOSPIAs or otherwise deprive them of the benefit of a contract that either has already been or will soon be a lucrative investment. *See Bauman v. United States Dist. Court*, 557 F.2d 650, 657 (9th Cir.1977) (acknowledging that number of class members who opt out is relevant to numerosity inquiry).

Second, the Estate fails to acknowledge that its class is made up of two mutually exclusive classes (one made up of living LOSPIA purchasers, another made up of estates

---

**6.** Genworth prepared a spreadsheet of data about potential class members. Stolle Decl., Ex. J. The court's rough sampling of that spreadsheet indicates that more than 20% of the class members have received more in payouts from Genworth than they paid in premiums, or have recovered more than 90% of their premiums. More than 40% of the class members have recovered more than 75% of their premiums.

of decedents who purchased LOSPIAs) and two subclasses of Washington residents or estates. The Estate must satisfy Rule 23 as to each of those classes and subclasses. Fed. R.Civ.P. 23(c)(5) ("[S]ubclasses ... are each treated as a class under this rule."); *Betts v. Reliable Collection Agency, Ltd.,* 659 F.2d 1000, 1005 (9th Cir.1981) ("[E]ach subclass must independently meet the requirements of Rule 23 for the maintenance of a class action."). The Estate does not attempt to show that its four classes and subclasses, by themselves, leap the numerosity hurdle.

In addition, the Estate fails to acknowledge that the nature of its claims counsels in favor of considering its claims on behalf of 50 state-by-state subclasses, none of which is likely to be numerous. The Estate brings claims solely under state law. As the court will soon discuss, each class member's claims are likely to arise under the law of the state in which he or she resides. Thus, assuming that the court is unwilling to certify a class subject to 50 different bodies of law, the Estate must satisfy the numerosity requirement as to state-by-state subclasses. *See Zinser,* 253 F.3d at 1190 (describing prior litigation in which plaintiffs salvaged class by creating state-by-state subclasses). With the exception of Washington, the Estate has not addressed the number of class members in any state.

There are approximately 17 potential class members in Washington. Pltf.'s Mot. at 28; Stolle Decl., Ex. A (Layton Depo. at 246). The court will ignore, for the moment, that some of those class members are living individuals and some are likely estates of Genworth LOSPIA purchasers, and that some will likely opt out of the class because their LOSPIAs have paid them more than they invested. Even putting aside those concerns, the Estate cannot satisfy the numerosity requirement as to its Washington subclasses. Although there is no minimum class size, a class of only 17 members would be a jurisprudential rarity. *See, e.g., General Tel. Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (noting that a 15–plaintiff class is too small); *Hum v. Dericks,* 162 F.R.D. 628, 634 (D.Hawai'i 1995) ("Courts have certified classes with as few as thirteen members, and have denied certifica-

tion of classes with over three hundred members."); *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995) (citing secondary sources for presumption that 40–plaintiff class is large enough). The critical inquiry, moreover, is not the absolute size of the class, but rather whether joinder of all members would be impractical. *Hum,* 162 F.R.D. at 634 ("There is no magic number for determining when too many parties make joinder impracticable."). In a case like this one, where there are business records identifying each Genworth LOSPIA customer, joinder is more practical. *Id.* This is especially true where the Washington subclass is, by definition, made up of Washington residents. *Id.* ("Joinder is generally considered more practicable when all members of the class are from the same geographic area.").

The Estate also fails to acknowledge that the relatively hefty up-front payment needed to purchase a LOSPIA means that each class member has a substantial interest in pursuing a suit, making joinder more practical. The Estate's evidence shows that several class members paid premiums of $1,000,000, very few paid premiums of less than $10,000, and that a rough average of class members' premiums is $50,000. Stolle Decl., Ex. J. Unlike some consumer class actions, where the challenged transaction involves such a small sum of money that it is unrealistic to expect individual suits, the amount at issue in a typical LOSPIA transaction is sufficient to encourage individual lawsuits. *See, e.g., Scott v. Cingular Wireless,* 160 Wash.2d 843, 161 P.3d 1000, 1006 (2007) ("Class actions are vital where the damage to any individual consumer is nominal."). Because each class member has a substantial monetary interest in pursuing relief, joinder is more practical.

■ Lastly, the Estate's choice to pursue class relief against Mr. Stern and Mr. Reese means that it must satisfy the numerosity inquiry as to each of them. Although courts have declined to force plaintiffs to satisfy Rule 23 on a defendant-by-defendant basis where the defendants participated in a common scheme to injure plaintiffs, this is not such a case. *See Westways World Travel, Inc. v. AMR Corp.,* 218 F.R.D. 223, 234 (C.D.Cal.2003) (citing cases). Here, Mr. Stern and Mr. Reese had contact with only a

defined subset of the class members, and there is no evidence that their conduct in selling Genworth LOSPIAs was part of a common scheme. *See German v. Federal Home Loan Mortg. Corp.*, 885 F.Supp. 537, 552 (S.D.N.Y.1995) (examining numerosity for each defendant separately). Indeed, the evidence shows that Mr. Stern's passive solicitation business model is not typical of the way other salespeople sell LOSPIAs.

As to Mr. Reese, the Estate wholly fails to present a case for class relief. The only available evidence suggests that Mr. Reese sold two LOSPIAs during his tenure at Genworth. Two plaintiffs satisfy the requirements for a tango, but not for a class action.

As to Mr. Stern, the evidence shows approximately 21 persons bought LOSPIAs from him, meet the Estate's class definitions, and have not received payouts from Genworth that make their participation in a class unlikely. Stern Decl. ¶ 18, Ex. F. Like Genworth, Mr. Stern has records identifying persons who bought LOSPIAs from him. *Id.* Like all class members, people who purchased LOSPIAs from Mr. Stern have significant financial incentive to pursue individual claims or join in another lawsuit. *Id.* For that reason, joinder is not impractical for persons with claims against Mr. Stern.

The court concludes its numerosity inquiry as follows. The Estate has failed to show a sufficiently numerous subclass of Washington residents or estates. The Estate has also failed to show a sufficiently numerous subclass of persons with claims against Mr. Stern or Mr. Reese.[7] As to its claims against Genworth on behalf of nationwide classes of living and deceased LOSPIA purchasers, the court declines to determine conclusively whether the classes are sufficiently numerous.

### 2. The Class Claims Present Some Common Questions of Fact and Law, But Also Present Substantial Questions of Varying State Law.

▇ Rule 23(a)(2) only requires the Estate to show that "there are questions of law

or fact common to the class." Although the Rule speaks of "questions" in the plural, courts have held that a single common issue is sufficient to meet the commonality requirement. *E.g., Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D.Cal.1996). By contrast, Rule 23(b)(3) requires class plaintiffs to show that common questions predominate over individualized questions. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998) ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3).").

The court finds that the Estate satisfies the minimal commonality standard of Rule 23(a)(2). For example, it is undisputed that Genworth sends nearly identical acknowledgment forms to every LOSPIA purchaser. This practice by itself raises common factual questions, but it also suggests that Genworth has class-wide knowledge regarding the suitability of LOSPIAs for persons 85 and older, and class-wide concerns that led it to decide to rely on the common acknowledgment forms.

For the most part, the court reserves a review of the many factual and legal questions that are not suitable for class-wide disposition for its later discussion of the predominance and superiority requirements of Rule 23(b)(3). One set of legal questions, however, requires immediate mention. As noted before, the class members' claims arise solely under state law. Because class members are dispersed among the 50 states, a question naturally arises: do 50 bodies of law apply to the class members' claims?

Strikingly, the Estate's motion for class certification ignores this question. Aside from an unsupported mention of Washington, Delaware, Virginia, and federal law, (Pltf.'s Mot. at 31), there is no discussion of the law applicable to the class members' claims. As the party seeking class treatment, the Estate bears the burden of addressing variations in state law among class members. *Zinser*, 253 F.3d at 1187.

---

7. The remainder of the court's order will not refer specifically to the subclasses comprised of Washingtonians and the subclasses composed of persons who purchased from Mr. Stern and Mr.

Reese. Nonetheless, the court notes that many of the concerns addressed later in this order apply equally to those subclasses.

Although the Estate initially avoided its burden to address choice-of-law issues, Genworth asserted in its opposition that most class members' claims will be governed by the law of the state in which they reside. According to Genworth, 50 states' laws apply in this action, and courts repeatedly refuse to certify classes under such circumstances. *See, e.g., Zinser,* 253 F.3d at 1189 (affirming denial of class certification); *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 698–99 (Tex.2002) ("State and federal courts have overwhelmingly rejected class certification when multiple states' laws must be applied.") (citing more than 50 cases).

In reply, the Estate finally acknowledged the presence of choice-of-law questions, but fell well short of providing a complete analysis. When a court exercises diversity jurisdiction in a class action, it applies the choice-of-law rules of the forum state. *Zinser,* 253 F.3d at 1187 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Washington choice-of-law guidelines require the application of Washington law unless there is an "actual conflict" with another applicable body of law. *Burnside v. Simpson Paper Co.,* 123 Wash.2d 93, 864 P.2d 937, 942 (1994). If a conflict exists, Washington uses a "most significant relationship" test for both contract and tort claims. *See Mulcahy v. Farmers Ins. Co.,* 152 Wash.2d 92, 95 P.3d 313, 317 (2004); *Rice v. Dow Chem. Co.,* 124 Wash.2d 205, 875 P.2d 1213, 1217 (1994). For contract claims, the test focuses on the place of contracting, the place of negotiation, the place of performance, and the residence of the parties. *Mulcahy,* 95 P.3d at 317 (citing Restatement (Second) of Conflict of Laws § 188). For tort claims, the test focuses on the place where the tortious conduct occurred, the place where the injury occurred, the residences of the parties, and the place in which the parties' relationship is "centered." *Rice,* 875 P.2d at 1217 (citing Restatement (Second) of Conflict of Laws § 145).

The Estate bears the burden of applying Washington's choice-of-law rules "to *each* non-forum state with an interest in the application of its law." *Zinser,* 253 F.3d at 1188 (emphasis in original). Not only must the Estate apply the rules to every state in which claims exist, it must apply the rules as to each of its tort and contract claims. *Id.* In a case like this one, with 50 bodies of law potentially applicable to at least six different tort and contract claims, the Estate's burden is onerous.

The Estate has not met its burden. It makes no attempt to survey the laws of the 50 states to determine whether they conflict with Washington law as to any of the claims in this action. *See Zinser,* 253 F.3d at 1188 (requiring plaintiff to assess conflicts with each non-forum state's law). It asserts that because Genworth is headquartered in Virginia, Virginia law or Washington law applies. At the threshold, the Estate fails to determine whether Washington and Virginia law conflict as to the claims of the class. It also ignores that very few of the class members live in Virginia, that the vast majority of LOSPIA sales were negotiated between non-Virginian salespeople and non-Virginian annuitants, that class members accrue damages in the states where they reside, and that there is no reason to suspect that class members would expect Virginia law, rather than the law of the state in which they reside, to apply to their claims. The court does not raise these concerns as a substitute for a complete choice-of-law analysis, because the Estate alone bears the burden to conduct this analysis. *Lozano v. AT & T Wireless Servs., Inc.,* 504 F.3d 718, 728 (9th Cir.2007) ("[W]e reject the notion that the district court was obligated to conduct a comprehensive survey of every state's law" in its class certification inquiry). Instead, the concerns highlight the Estate's failure to establish that the choice-of-law issues in this case lead to common questions of law. *See In re Dalkon Shield IUD Prods. Liab. Litig.,* 693 F.2d 847, 850 (9th Cir.1982) (questioning commonality where 50 states' punitive damages laws applied to class claims). Although this failure does not prevent the Estate from satisfying the minimal commonality requirement of Rule 23(a)(2), it will raise insurmountable obstacles when the court later considers whether common questions of fact and law "predominate" in this action under Rule 23(b)(3).

### 3. Mr. Felts' Unique Circumstances Raise Concerns That He Is Not a Typical Class Representative.

■ Unlike the numerosity and commonality criteria, the criteria of adequacy of representation and typicality focus on the class representatives. *See Hassine v. Jeffes*, 846 F.2d 169, 176 (3d Cir.1988) (" '[C]ommonality' like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff[s]"). Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class...." Although Rule 23(a)(3) refers to the "claims *or* defenses of the representative parties," a court should consider both the typicality of the class representative's claims and the defenses to which he is subject. *See Hanlon*, 150 F.3d at 1020; *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992) ("[A] motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.") (internal quotation omitted). Rule 23(a)(3)'s standards are permissive: claims or defenses are typical "if they are reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

There is little evidence that Mr. Felts' claims are reasonably coextensive with those of absent class members. First, as previously noted, Mr. Felts purchased his Genworth LOSPIAs solely from Mr. Stern and Mr. Reese. There is no reason, on the record before the court, to believe that the experience that a typical customer of Mr. Stern or Mr. Reese compares to the experience of a customer who purchased Genworth LOSPIAs from a large financial institution or from another authorized salesperson. Assuming that the Estate's allegations are true, it is fair to characterize the class members as having suffered the same or similar injuries. The Estate fails to provide any evidence, however, that those injuries "result from the same, injurious course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001). Lacking such evidence, the Estate is on shaky ground in its effort to show typicality.

The Estate's assertion of typicality only weakens when the court considers the unique defenses to which Mr. Felts will be subject. Mr. Felts' substantial experience purchasing annuities, coupled with his vocal insistence that he understood the risks and benefits of the LOSPIAs he purchased, make him a poor class representative. The Estate rails against Genworth for preying on "elderly consumers [who] are most vulnerable to this type of incipient fraud, playing on their inherent trust in humanity and fear of outliving their assets." Pltf.'s Mot. at 23 (adding that the elderly are "least likely to seek redress after succumbing to such predatory sales practices"). It is unfortunate, then, that the Estate has chosen Mr. Felts as the representative for a class of such allegedly vulnerable elderly people. Mr. Felts spontaneously declared, in writing, that he understood that he would receive nothing from his LOSPIAs after he died, and that he might never recover the premiums he invested. He chastised the "young whippersnappers" who required him to repeatedly acknowledge the risks of the LOSPIAs he purchased. While the Estate typecasts Genworth as predator and the class members as prey, Mr. Felts defies that characterization. If there are class members who were confused by the nature of LOSPIAs, who were "preyed" upon by unscrupulous salespeople, who paid premiums without understanding that they and their estates might never recover them, then Mr. Felts is a poor representative for their claims.

In noting Mr. Felts' unique attributes as a member of the class, the court does not suggest that it has decided whether Mr. Felts truly understood LOSPIAs, or whether he was misled by Mr. Reese or Mr. Stern. Deciding such questions is inappropriate at the class certification stage. Instead, the court raises these issues because Genworth will certainly raise them in an effort to show that Mr. Felts knew what he was doing when he purchased LOSPIAs, and because Genworth will have ample evidence to support that effort. The court is reluctant to certify a class to be led by the Estate of a man

whose unique circumstances and conduct subject his claims to obvious attacks.

Finally, as to classes made up of living LOSPIA purchasers, Mr. Felts is not a typical member of the classes, because he is not a member of the classes at all. Class membership is a minimal prerequisite to a finding of typicality. *Falcon,* 457 U.S. at 156, 102 S.Ct. 2364 ("We have repeatedly held that a class representative must be part of the class") (internal quotation omitted). As the court will discuss later, the Estate's inability to represent living class members raises other difficulties as well.

### 4. Potential Conflicts of Interest Raise Questions as to Whether the Estate is an Adequate Class Representative.

▇ Rule 23(a)(4) requires the Estate to show that "the representative parties will fairly and adequately protect the interests of the class." In determining whether the Estate is an adequate class representative, the court must consider if it has "any conflicts of interest with other class members" and whether it will "prosecute the action vigorously on behalf of the class." *Hanlon,* 150 F.3d at 1020.[8] The record in this action demonstrates the Estate's willingness to vigorously pursue this action on behalf of the class.

There are, however, at least two conflicts of interest inherent in the Estate's representation of the class. The Estate seeks injunctive relief, but has no incentive to pursue it. The Estate has nothing to gain from prospective relief. *See Ellis v. Costco Wholesale Corp.,* 240 F.R.D. 627, 641 (N.D.Cal.2007) (noting adequacy questions where sole class representative has no incentive to seek injunctive relief). In addition, because class members are spread over 50 states, and must rely on state law for relief, it is possible that some class members would benefit from pursuing theories of relief uniquely available under their states' laws. The Estate resides in Washington, and it cannot benefit from the assertion of additional claims for relief under other states' laws. These conflicts raise serious questions about the Estate's adequacy as a class representative. In light of the court's analysis of the other Rule 23 requirements, however, it is not necessary to consider whether the Estate could take measures to cure these conflicts.

### D. The Estate Does Not Satisfy Any Requirements of Rule 23(b).

Many of the issues the court highlighted in its review of the requirements of Rule 23(a) might, by themselves, be sufficient bases to deny class certification. Considering the additional requirements of Rule 23(b), however, leads the court to conclude that class treatment is not appropriate in this action. A proposed class need only satisfy one of the three requirements of Rule 23(b). The Estate asserts that the class satisfies both Rule 23(b)(1) and Rule 23(b)(3).

### 1. The Class Does Not Satisfy Rule 23(b)(1).

▇ Rule 23(b)(1) applies only in the following circumstances:

[Where] prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed.R.Civ.P. 23(b)(1). The first prong of the rule "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using

---

8. Rule 23(g) of the Federal Rules of Civil Procedure calls upon the court to consider the adequacy of the class representative's counsel. When asked at oral argument, Genworth raised no challenge to the adequacy of class counsel. The court's review of the declarations that the Estate's counsel submitted raises no concerns about the adequacy of counsel.

water as against downriver owners)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citation omitted). The possibility of varying monetary judgments or liability determinations in individual actions does not bring an action under Rule 23(b)(1)(A). *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir.1973); *Zinser*, 253 F.3d at 1193. Indeed, Rule 23(b)(1)(A) is "[i]nfrequently, if ever" applicable to an "action for money damages." *La Mar*, 489 F.2d at 466; *see also Zinser*, 253 F.3d at 1193 ("Certification under Rule 23(b)(1)(A) is ... not appropriate in an action for damages."). With the possible exception of its claims for injunctive relief, which the Estate lacks standing to pursue, there is no risk of binding inconsistent adjudications in this case. It does not fall under Rule 23(b)(1)(A).

■ The second prong of Rule 23(b)(1) applies where a limited fund or other constraint means that one court's adjudication could prejudice other class members. *Amchem*, 521 U.S. at 614, 117 S.Ct. 2231; *Zinser*, 253 F.3d at 1196–97 (describing limited fund cases). There is no evidence that Genworth lacks the funds to satisfy all class members' claims. There is no reason to suspect that adjudication of individual claims against Genworth would prejudice other plaintiffs. *See McDonnell Douglas Corp. v. United States Dist. Court*, 523 F.2d 1083, 1086 (9th Cir.1975) (denying Rule 23(b)(1)(B) certification where "individual actions would leave unnamed members of the class with the same complexity and expense as if no prior actions had been brought"); *La Mar*, 489 F.2d at 467 (denying Rule 23(b)(1)(B) certification where "success or failure of the plaintiffs in their individual actions will not inescapably alter the rights of others similarly situated").

## 2. The Estate Satisfies Neither the Predominance nor the Superiority Requirements of Rule 23(b)(3).

The court now turns to the Estate's effort to certify the proposed class under Rule 23(b)(3). Rule 23(b)(3) requires a plaintiff to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). In making these findings, the court considers the following non-exclusive list of factors:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3). The purpose of the "predominance" and "superiority" requirements for a Rule 23(b)(3) class action is to ensure that class treatment will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231 (quoting Fed.R.Civ.P. 23 advisory committee's notes (1966)).

### a. Individual Issues Predominate In This Action.

■ In determining whether common issues predominate over individual issues, no precise formula guides the court. The court must simply determine whether resolution of common questions would resolve a "significant aspect" of the class members' claims such that there is "clear justification" for class treatment. *Hanlon*, 150 F.3d at 1022 (citations omitted).

The court is convinced that in this action, unique issues of fact and unique questions of law will predominate over common questions or issues. The Estate opens its motion for class certification with a laundry list of "deceptive sales and marketing practices," ranging from failure to disclose the actuarial tables that Genworth used to price LOSPIAs, to failing to make a more detailed inquiry into the financial circumstances of customers, to misrepresenting the non-refund nature of the LOSPIAs. Pltf.'s Mot. at 3–5. Striking-

ly absent from the list is any information about *who* was engaging in these allegedly wrongful practices. As far as the record reveals, the "who" in this case is hundreds of large financial institutions, insurance brokerages, and independent agents who market Genworth LOSPIAs in hundreds of different ways. Genworth does not control their marketing and sales practices. To the extent that salespeople can rely on Genworth marketing materials if they choose to, there is no evidence regarding how many of them have made that choice. There is also no evidence of what practices, if any, caused injury to class members. Under these circumstances, individualized questions will dominate in this action.

In addition to these individualized factual questions, many bodies of state law, perhaps as many as 50, are likely to apply in this action. *Lozano*, 504 F.3d at 728 ("[P]redominance requires the district court to consider variations in state law when a class action involves multiple jurisdictions."). A party seeking to certify a nationwide class bears the burden to "demonstrat[e] a suitable and realistic plan for trial of the class claims." *Zinser*, 253 F.3d at 1189 (internal quotation omitted). The Estate has not offered a suitable and realistic plan for addressing the disparate issues of law and fact that will arise in this action.

### b. Individual Claims are Superior to Class Treatment for Resolving the Class Members' Claims.

The court is also convinced that individual claims, rather than class treatment, are a superior means of providing relief for persons injured by the purchase of a Genworth LOSPIA. To challenge the varied practices that allegedly induced class members to purchase Genworth LOSPIAs, the Estate offers only itself as a class representative. The court cannot conclude that having a single representative represent the claims of hundreds of purchasers across the nation, all of whom purchased from different salespeople using different practices, is a superior means of resolving their claims. The court's conviction is only strengthened when it considers that Mr. Felts, with his frequent proclamations of his understanding of LOSPIAs and their risks and benefits, is a poor representative for the proposed class.

Individual actions, rather than class actions, have marked advantages under these circumstances. First, as noted above, the relatively large premiums that class members invested in their LOSPIAs mean that there is substantial incentive for an individual who believes that Genworth wrongfully extracted that premium to bring suit. The court recognizes that neither party has presented evidence of individual actions challenging Genworth's LOSPIA sales, but that is equally consistent with purchasers' views that the sales are lawful. If there is an individual who believes Genworth acted unlawfully, that individual will be able to challenge the specific practices that induced his or her purchase and the specific written or oral materials that deceived or mislead him. That individual will be able to argue that such practices were unlawful in light of his or her unique circumstances. That individual will not have to rely on Mr. Felts, a serial annuity purchaser with extensive experience in the life insurance industry, as the representative for his claim. That individual will be able to present claims in his or her own state's courts, and tailor claims to his or her state's law. For all of the reasons stated above, a nationwide class consisting of a single Washingtonian class representative with unique circumstances is a poor way to pursue such claims.

To conclude its class certification discussion, the court notes that the Estate and the class it seeks to represent stumble at every step of the Rule 23 inquiry. Many of those stumbles would suffice, by themselves, as reasons to deny class certification. Considering the Rule 23 requirements as a whole, however, the court finds that class certification is manifestly inappropriate in this action.

### E. The Court Disposes of the Parties' Miscellaneous Motions for Relief.

Defendants seek to exclude the declaration of Vincent Micciche, an experienced insurance compliance officer who offers expert testimony. Defendants claim that the Estate did not timely disclose its intent to rely on

Mr. Micciche as an expert. The court has reviewed Mr. Micciche's declaration and has determined that it is of no assistance to the Estate's motion for class certification. Mr. Micciche's declaration offers many opinions as to whether Genworth's practices are ethical or acceptable in the insurance industry. While such opinions might be relevant to the merits of the Estate's claims, they do not help the court determine whether class treatment is appropriate. Defendants' motion to exclude evidence from Mr. Micciche is therefore moot.

In its motion for class certification, the Estate relied upon deposition testimony and two exhibits that Genworth had designated as confidential pursuant to a stipulated protective order. Stolle Decl., Exs. A–1, J, K. In compliance with that order, the Estate moved to seal the documents, and placed the burden upon Genworth to provide a basis for sealing the documents. The court's review of Genworth's submissions reveals that these exhibits contain confidential information about Genworth's annuity pricing. The court relied on this evidence in limited fashion to establish certain characteristics of the proposed classes, including where class members reside, how much they invested in LOSPIAs, and the amount of payments they received from Genworth. Although the court would prefer to make any exhibit on which it relies part of the public record, the court finds good cause to shield this information from the view of Genworth's competitors. The court therefore grants the motion to seal.

Finally, the Estate moved for leave to file an overlength reply brief supporting its class certification motion on the same day it filed a 36–page reply brief. Although the Estate could have filed up to 20 pages in reply without violating the rules, it decided instead to ignore Local Rule 7(f)(1), which requires a party to move for leave to file an overlength brief at least 3 judicial days before the brief is due. There is no justification for the Estate's disregard of court rules, and the court's review of the reply brief suggests

that the Estate could have presented its arguments much more concisely.[9] The court therefore denies the untimely motion. In the interests of the proposed class members however, the court has considered the Estate's overlength reply brief in its entirety.

## IV. CONCLUSION

For the reasons stated above, the court DENIES the Estate's motion for class certification (Dkt. # 72), DENIES as moot Genworth's motion to exclude the testimony of Vincent Micciche (Dkt. # 61), GRANTS the Estate's motion to seal (Dkt. # 78), and DENIES the Estate's untimely motion to file an overlength reply brief (Dkt. # 96).

---

9. The court's admonitions about conciseness apply to all parties in this case. Each party sought, and received, leave to file overlength motions or oppositions. The court's review of these documents suggests that all parties would have benefitted from less prolix briefs that focused narrowly on issues relevant to class certification.