**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JUST FILM, INC.; RAINBOW
BUSINESS SERVICES, DBA
PRECISION TUNE AUTO CARE;
VOLKER VON GLASENAPP; JERRY
SU; DIETZ TOWING INC.; THE
ROSE DRESS INC.; VERENA
BAUMGARTNER; TERRY JORDAN;
LEWIS BAE; ERIN CAMPBELL,
　　　　　　*Plaintiffs-Appellees*,

v.

SAM BUONO; JAY COHEN; SARA
KRIEGER; MBF LEASING LLC;
LEONARD MEZEI; NORTHERN
FUNDING, LLC; NORTHERN
LEASING SYSTEMS, INC.; SKS
ASSOCIATES LLC,
　　　　　　*Defendants-Appellants.*

No. 14-16132

D.C. No.
4:10-cv-01993-CW

| | |
|---|---|
| RAINBOW BUSINESS SERVICES, DBA Precision Tune Auto Care; VOLKER VON GLASENAPP; JERRY SU; DIETZ TOWING INC.; THE ROSE DRESS INC.; VERENA BAUMGARTNER; TERRY JORDAN; LEWIS BAE; ERIN CAMPBELL, *Plaintiffs-Appellees*, <br><br> v. <br><br> SAM BUONO; JAY COHEN; SARA KRIEGER; MBF LEASING LLC; LEONARD MEZEI; NORTHERN FUNDING, LLC; NORTHERN LEASING SYSTEMS, INC.; SKS ASSOCIATES LLC, *Defendants-Appellants.* | No. 14-16133 <br><br> D.C. No. 4:10-cv-01993-CW <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted September 15, 2016
San Francisco, California

Filed February 7, 2017

Before:  Ronald M. Gould and Marsha S. Berzon, Circuit Judges, and John R. Tunheim,[*] Chief District Judge.

Opinion by Judge Gould

## SUMMARY[**]

### Class Certification

The panel affirmed the district court's orders certifying two national classes pursuant to Federal Rule of Civil Procedure 23(b)(3) in an action under RICO, the Fair Credit Reporting Act, and state law.

Small businesses and small business owners who leased "point of sale" credit and debit card processing equipment alleged that the "Leasing Defendants," a group of entities that financed their acquisition of the equipment, defrauded them in a scheme that involved equipment leases and credit card processing services.

The panel held that the district court did not abuse its discretion in certifying the "SKS Post-Lease Expiration Class" and the "Property Tax Equipment Cost Basis Class" to pursue claims under RICO and California state law. The panel held that plaintiffs established typicality, commonality,

---

[*] The Honorable John R. Tunheim, Chief United States District Judge for the District of Minnesota, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and predominance for the SKS Post-Lease Expiration Class. The plaintiffs established commonality, predominance, and superiority for the Property Tax Equipment Cost Basis Class.

**COUNSEL**

Thomas J. Kavaler (argued), Cahill Gordon & Reindel LLP, New York, New York; Robert D. Lillienstein and Scott E. Silberfein, Moses & Singer LLP, New York, New York; Rod Divelbiss, JRA Law Partners LLP, San Francisco, California; for Defendants-Appellants.

Adam J. Gutride (argued) and Seth A. Safier, Gutride Safier LLP, San Francisco, California, for Plaintiffs-Appellees.

**OPINION**

GOULD, Circuit Judge:

Plaintiffs-Appellees are small businesses and small business owners who leased "point of sale" credit and debit card processing equipment. They allege that Defendants-Appellants (the "Leasing Defendants") defrauded them in a scheme that involved equipment leases and credit card processing services. Plaintiffs moved to certify five national classes with California-based subclasses under Federal Rule of Civil Procedure 23(b)(3). Of the five proposed national classes, the district court certified two: the "SKS Post-Lease Expiration Class" and the "Property Tax Equipment Cost Basis Class." Leasing Defendants appeal the district court's orders certifying these two classes.

Because we conclude that the district court did not abuse its discretion in certifying the SKS Post-Lease Expiration Class and the Property Tax Equipment Cost Basis Class, we affirm.

**I**

**A.  Background**

Plaintiffs are small businesses and small business owners who leased "point of sale" credit and debit card processing equipment, such as swipe terminals and pinpads.  Plaintiffs allege that Leasing Defendants, a group of entities who financed their acquisition of the equipment, defrauded them in a scheme involving equipment leases and credit card processing services.

Plaintiffs describe the alleged fraud that swindled them as follows: Credit and debit card transactions are processed through financial networks called interchanges that are run by entities such as Visa and Mastercard.  Financial institutions may become members of the interchange and can then sell card processing services directly to merchants or indirectly through entities known as Independent Sales Organizations and Merchant Service Providers ("ISOs/MSPs").  ISOs/MSPs must be licensed and registered with the financial institutions and both Visa and Mastercard.  Merchants must acquire specific equipment necessary to process credit and debit card transactions and must also pay a fee for each transaction.

Plaintiffs allege that Leasing Defendants conspired with the ISO/MSP Defendants (the "Merchant Service Defendants") to market fraudulent, long-term equipment leases and credit card processing services to merchants.

Merchant Service Defendants sought merchants and induced them to enroll in such leases through "a series of deceitful misrepresentations and forged documents," whereby merchants paid fees in excess of standard industry rates. The high lease costs did not pay for the equipment, but instead, primarily went toward Merchant Service Defendants' commissions for securing the leases and toward Leasing Defendants' profits.

### 1.  The Post-Lease Tax Collection Scheme

More specifically, Plaintiffs allege that in 2011, Leasing Defendants conspired among themselves to defraud former lessee merchants by collecting or attempting to collect taxes that were not actually due or paid to any taxing authority. Leasing Defendants calculated property taxes using inaccurate tax information, such as the wrong property tax base and incorrect years that lessees were enrolled in the leases, and compiled the results in a spreadsheet called Schedule 1.  Schedule 1 listed more than 107,000 merchants owing over $10 million in back property taxes and administrative fees.  Leasing Defendants next instructed a third party to send a form letter to the former lessees telling them that Defendant SKS Associates LLC had acquired collection rights, and deductions would occur based on the purported back taxes merchants owed.  Leasing Defendants collected the taxes and fees from merchants with expired leases by making misrepresentations to third party processors and causing processors to authorize Automated Clearing House ("ACH") withdrawals from the merchants' bank accounts.  Many accounts were actually debited, but Leasing Defendants could only attempt to debit closed bank accounts associated with expired leases.  Leasing Defendants also created a network of shell companies to "ensure[] that their

unlawful acts remain hidden and that victims and the courts are unable to identify the responsible party."

Plaintiff Erin Campbell does business as the Silicon Valley Pet Clinic. Campbell seeks to represent a class of lessees targeted under this post-lease expiration tax collection scheme. She entered into a lease for a credit card terminal with CIT Corporation and provided her bank account information to make monthly payments of about $86.55. GCN Holdings, LLC later acquired Campbell's lease, and Defendant Northern Leasing Systems serviced the lease on behalf of GCN. Campbell began taking steps to terminate her lease in January 2007 and completed termination in June 2007. Yet, in March 2011, Campbell received a letter (the "Notice of Debt") from Defendant SKS Associates, which Plaintiffs allege was written by Defendant Northern Leasing Systems. The letter stated that SKS Associates had acquired the rights and title to her old lease, that she owed $85.50 for taxes and filing costs associated with her equipment, and that the amount would be deducted on March 15, 2011. Campbell called SKS Associates about the charge, and the customer service representative stated that Leasing Defendants had paid taxes on Campbell's behalf and that she now owed them for that payment. The representative warned Campbell that if she did not pay, Leasing Defendants would report the amount owed to credit bureaus and pursue other methods of collection. Campbell alleges she spent several hours of her normal work time investigating the claims in the letter and paid an employee $7.50 to investigate the claims and compute what Campbell paid during the lease.

**2.  The Property Tax Scheme**

Plaintiffs also allege that Leasing Defendants collected property taxes using an inaccurate methodology: rather than collecting property taxes based on the actual cost of equipment (the "Equipment Cost"), Leasing Defendants calculated taxes using a higher base—the stream of income a lease generated (the "Acquisition Cost"). Plaintiffs contend that the difference between the two costs is large. For example, Plaintiff Just Film's Acquisition Cost was $5,429.19, and Plaintiff Dietz Towing's Acquisition Cost was $3,686. By contrast, the Equipment Cost was only $358.

Leasing Defendants collected property taxes using the higher Acquisition Cost as the tax base for several years but later switched to calculating property tax using the Equipment Cost as the tax base. Plaintiffs allege that after the switch, Defendant Northern Leasing Systems never told merchants that it had wrongly overcharged them for property taxes and did not take any steps to refund merchants for its mistakes.

**B.  Procedural History**

Plaintiffs filed a putative class action in state court, which Defendants removed to federal court. In their Third Amended Class Action Complaint, Plaintiffs allege violations of Sections 17200 and 17500 of the California Business and Professions Code; violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681; breach of contract; deceit and/or misrepresentation; negligent misrepresentation; and conversion.

In April 2011, Plaintiffs filed an application for a temporary restraining order, asking the district court to enjoin Leasing Defendants' collection of post-lease expiration taxes and administrative fees. The district court granted the application, and in June 2011, issued a preliminary injunction. We affirmed the preliminary injunction order in *Just Film, Inc. v. Merchant Servs., Inc.*, 474 F. App'x 493 (9th Cir. 2012).

In December 2013, the district court granted a motion for final approval of the class action settlement with respect to the Merchant Service Defendants.

In May 2013, Plaintiffs filed a motion for class certification, seeking to certify an overarching class and five separate subclasses under Rule 23(b)(3). Two of the subclasses were certified and are relevant to this appeal: (1) the "SKS Post-Lease Expiration Class," and (2) the "Property Tax Equipment Cost Basis Class."[1] The SKS Post-Lease Expiration Class is defined as "[a]ll persons and businesses whose lease numbers appeared on Schedule 1" with a national class pursuing RICO and RICO conspiracy claims and a California subclass pursuing an Unfair Competition Law ("UCL") claim under Section 17200 of the California Business and Professions Code. The Property Tax Equipment Cost Basis Class is defined as "[a]ll persons and businesses who [from March 26, 2006 to the present] paid any Leasing Defendants property taxes based on a cost greater than the 'equipment cost'" with a national class seeking to bring RICO, RICO conspiracy, fraud, and breach

---

[1] The three non-certified classes—the "Excessive Lease Amount Subclass," the "Property Tax Fee Non-Disclosure Class," and the "Credit Monitoring Class"—are not at issue on appeal.

of contract claims, and a California subclass seeking to bring negligent misrepresentation, breach of the duty of good faith and fair dealing, and UCL claims.

The district court granted Plaintiffs' class certification motion in part on December 20, 2012. The court certified the California subclass of the proposed SKS Post-Lease Expiration Class to pursue a UCL claim; the Property Tax Equipment Cost Basis Class to pursue a breach of contract claim; and the California subclass of the Property Tax Equipment Cost Basis Class to pursue a claim for breach of the duty of good faith and fair dealing and a UCL claim.

Thereafter, Campbell filed a motion requesting leave to file a motion for reconsideration of that order. The district court granted Campbell's motion for reconsideration, and on March 17, 2014, the court certified the nationwide SKS Post-Lease Expiration Class to pursue RICO and RICO conspiracy claims.

Leasing Defendants filed, pursuant to Federal Rule of Civil Procedure 23(f), a petition for permission to appeal the orders, which we granted. In this consolidated appeal, Leasing Defendants challenge the district court's class certification orders, arguing that: (1) Plaintiffs did not establish typicality, commonality, and predominance for the SKS Post-Lease Expiration Class; and (2) Plaintiffs did not establish commonality, predominance, and superiority for the Property Tax Equipment Cost Basis Class.

## II

We have jurisdiction under 28 U.S.C. § 1292(e). We review a district court's decision to certify a class for abuse

of discretion, and accord the district court "noticeably more deference" when reviewing a grant of class certification than when reviewing a denial. *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010)). "An abuse of discretion occurs when the district court, in making a discretionary ruling, relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them." *Parra v. Bashas', Inc.*, 536 F.3d 975, 977–78 (9th Cir. 2008) (internal quotation marks omitted). Despite the considerable deference we give to a grant of class certification, it will always be considered an abuse of discretion if the district court materially misstates or misunderstands the applicable law. *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010) ("[T]his court has oft repeated that an error of law *is* an abuse of discretion.") (emphasis in original).

## III

The district court certified two Rule 23(b)(3) classes. Gaining certification under that provision is a two-step process. A plaintiff must first show that the class meets the following four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;

(3) the claims or defenses of the
representative parties are typical of the claims
or defenses of the class; and

4) the representative parties will fairly and
adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). Next, the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Zinser*, 253 F.3d at 1186. The party seeking class certification bears the burden of demonstrating that the class meets the requirements of Federal Rule of Civil Procedure 23. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

## A.  The SKS Post-Lease Expiration Class

Campbell represents the SKS Post-Lease Expiration Class in pursuing RICO, RICO conspiracy, and UCL claims. She alleges that Leasing Defendants debited or attempted to debit bank accounts of former lessees in a spurious tax collection scheme. Leasing Defendants argue that Campbell's RICO claim is not typical of the class, and that Plaintiffs did not establish commonality and predominance. To establish a civil RICO claim, a plaintiff must establish: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to

plaintiff's business or property." *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (internal quotation marks omitted).

We address the challenges to class certification raised on this appeal.

### 1.  Typicality

Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative "aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). The requirement is permissive, such that "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (quoting *Hanon*, 976 F.2d at 508). A court should not certify a class if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508 (internal quotation marks omitted).

Leasing Defendants argue Campbell's claim is not typical of the class because (1) Campbell's legal theory is different from that of the class, (2) her injuries are based on a different

predicate act than the injuries of the class, (3) her damages are different from those of the class, and (4) she faces unique defenses. We reject each argument and conclude that the district court did not err in finding Campbell's claim typical of the class.

First, Leasing Defendants mischaracterize Plaintiffs' legal theory. Leasing Defendants describe it as follows: they made misrepresentations to two third-party ACH processors, and the ACH processors relied on the misrepresentations and debited class members' bank accounts without authorization. Therefore, Leasing Defendants assert the class's injuries are attributable to third-party reliance on Leasing Defendants' alleged misrepresentations, and Leasing Defendants assert that Campbell's own legal theory necessarily differs from that of the class because her bank account was not actually debited.

Plaintiffs actually allege a broader fraudulent scheme in which Leasing Defendants conspired to defraud former lessees through a course of conduct which injured Campbell as well as other class members. Plaintiffs allege that Leasing Defendants planned to collect from former lessees past taxes that were not due, and that as part of the fraudulent scheme, Leasing Defendants ran a faulty simulation to calculate the taxes and fees of more than 107,000 merchants with expired leases, with the results compiled on Schedule 1; sent letters to merchants that inaccurately stated that an audit had revealed that the merchants owed property taxes and administrative fees; created another entity to ensure that ACH regulators would not learn that Leasing Defendants were collecting payments; applied to new banks to access the ACH system to debit the bank accounts associated with the expired

leases; sent collections letters to third party bank processors; and sent electronic notices to merchants' banks.

Campbell is one of the merchants from whom Leasing Defendants made or attempted to make unauthorized ACH deductions. Plaintiffs presented evidence showing that Campbell was the personal guarantor of an expired lease; that she received a letter from SKS advising her that an audit was conducted and that she owed $85.50 for certain taxes and related fees; that she called Defendants and they informed her that she owed money; and that Defendants subsequently admitted that the amount they sought to collect from Campbell was inaccurate. Campbell's claim is reasonably coextensive with that of the class because she alleges Leasing Defendants committed the *same* overall course of misconduct against other members of the class—seeking to collect alleged past taxes and fees through subterfuge and misrepresentation—and the class's alleged injuries also resulted from that course of misconduct. *See Parsons*, 754 F.3d at 686 (concluding that the named plaintiffs met the typicality requirement because their injury "is a result of a course of conduct that is not unique to any of them; and they allege that the injury follows from the course of conduct at the center of the class claims") (citing *Hanon*, 976 F.2d at 508). Her claim is typical of the class because it shares "some common question of law and fact with class members' claims." Newberg on Class Actions § 3:31 (5th ed.).

Leasing Defendants next make the closely related argument that Campbell's claims are not typical because they do not focus on the same injurious conduct as that of the class. They contend that Campbell was harmed by the Notice of Debt sent directly to her, whereas the class alleges injury based on the misrepresentations made to the ACH processors.

Plaintiffs stress that all class members need not have suffered an identical injury; instead, they need to prove that Leasing Defendants engaged in a pattern of racketeering, and that at least one of the acts within the pattern caused the class injury. According to Plaintiffs, all class members, including Campbell, have been injured by Leasing Defendants' course of conduct.

Again, Leasing Defendants construe Plaintiffs' claim too narrowly. The proposed SKS Post-Lease Expiration class's RICO and RICO conspiracy claims are based on a *broader* scheme that Leasing Defendants crafted to collect purported back taxes and administrative fees. The pattern of racketeering includes Leasing Defendants' alleged misrepresentations to ACH processors, but also include the letters Leasing Defendants sent to class members claiming an audit revealed additional property taxes and fees were owed and concealing their identity to banks and merchants while pursuing collection.

Campbell's injuries stem from the same scheme, although the specific predicate act that caused her injury may differ from the acts that caused injury to other class members. Substantively, Campbell's allegation of harm based on some of the activities comprising the RICO violation is sufficient. *See Deppe v. Tripp*, 863 F.2d 1356, 1366 (7th Cir. 1988) ("[N]o requirement exists that the plaintiff must suffer an injury from two or more predicate acts, or from *all* of the predicate acts. Thus, a RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury.") (internal citation omitted); *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir.1987) (holding that the RICO statute required only injury from "any predicate act," not from an entire

pattern of racketeering). Given the nature of RICO liability, the typicality requirement necessarily focuses on whether Campbell was injured by the same *pattern* of racketeering as the other class members.

Defendants next contend that Campbell's injury is different from the rest of the class because ACH processors did not actually debit her account. It is true that Campbell's account was not actually debited because it was closed, while members of the class did have funds debited from their bank accounts without authorization. Instead, Campbell alleges damages in the form of time taken off from work and payment to an assistant to research her financial records upon receiving the Notice of Debt. Plaintiffs describe the class's injuries as: (1) the amounts Defendants debited from their bank accounts; and (2) costs class members incurred as a result of Defendants' bogus collection efforts. Plaintiffs maintain that Campbell and the class were injured by the same course of conduct, and argue that the differences in the nature of the injuries are relevant only to the *extent*, and calculation, of damages.

The district court cited to this court's decision in *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007), to support its conclusion that differing injuries do not defeat typicality in this action. The district court was correct in its analysis. The relevant portion of *Lozano* holds, "it is not necessary that all class members suffer the same injury as the class representative" to satisfy Rule 23(a)(3). *Id.* at 734.[2]

---

[2] In *Lozano*, the plaintiff sought to represent a class of California customers who were charged for calls made in a different billing period than the billing period in which the calls were made. *Id.* at 721–22. The plaintiff was charged an overage fee and received a one-time

The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class. Although Campbell was able to fend off the attempted fraud before it reached into and diminished her bank account, there is no reason why she cannot prove the nature of the fraudulent scheme for benefit of all class members, whether or not their precise injuries are identical.

The district court did not misapply *Lozano*, as Leasing Defendants contend. The district court did not abuse its discretion in concluding that Campbell's RICO claims are the same as those of the class and the claim is based on Defendants' conduct not unique to Campbell. Even if Campbell's damages differ from the damages of some class members, typicality is not defeated. The class includes merchants whose accounts were actually debited, as well as merchants who spent resources to investigate the Notice of Debt or other representations of the debt owed and so frustrated the fraudulent scheme before it directly impacted their bank accounts.

---

reimbursement after complaining about the fee. *Id.* at 722. The phone carrier defendant argued that the plaintiff's claimed damages of reserving minutes, where a certain number of minutes were saved to compensate for late-charged calls from the previous billing cycle, was unique. *Id.* at 734. Although some customers were charged overage fees and other customers reserved their minutes, this court affirmed the district court's finding that the plaintiff's injuries were typical of the class. *Id.* A plaintiff who reserved his minutes had a typical claim as the class, which included customers charged an overage fee and customers who reserved their minutes. *Id.*

Leasing Defendants next argue that Campbell is subject to a unique defense—lack of standing to pursue the RICO claim—such that certification of the SKS Post-Lease Expiration Class was wrong. To establish standing, "a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was by reason of the RICO violation, which requires the plaintiff to establish proximate causation." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (internal quotation marks omitted). Leasing Defendants contend that the district court did not address the second element. They again stress that the wrongful conduct alleged by the SKS Post-Lease Expiration Class is predicated on Defendants' misrepresentations toward two third-party ACH processors. These two processors then relied on the misrepresentations and went on to improperly debit class members' bank accounts without permission. By contrast, Leasing Defendants argue that Campbell's injury is not a direct or indirect result of this conduct. Because Campbell's account was not debited, the argument goes, the misrepresentations were not the proximate cause of Campbell's injuries.

We once more reject Leasing Defendants' repeated attempt to narrow the scope of activities that comprise the alleged RICO violation. Campbell alleges she suffered an injury to her "business or property" because of Leasing Defendants' misconduct. The district court properly concluded that Campbell had standing to pursue the RICO claim because, although Defendants did not deduct money from her bank account, she spent time away from her usual work and paid an assistant to help her research and compile records responding to a fraudulent allegation. This amounted

to a loss to business or property sufficient to confer standing. *See Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005).

Finally, Leasing Defendants argue that Campbell would be a poor advocate for the SKS Post-Lease Expiration Lease class members. They cite to *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016) ("*Payment Card Interchange*"), to support their argument that Campbell could not zealously advocate for class members with accounts actually debited. In *Payment Card Interchange*, the Second Circuit vacated the final approval of a class action settlement between merchants and Visa, Mastercard, and other banks. *See id.* at 227. The court concluded that class counsel's unitary representation of the plaintiffs was inadequate, as class counsel represented both merchants in a Rule 23(b)(3) class, pursuing solely monetary relief, and merchants in a Rule 23(b)(2) class, pursuing solely injunctive relief. *Id.* at 233. The court reasoned that in this settlement, "[u]nitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order somehow to reach a settlement." *Id.* at 234. The court was concerned with problems that arise when "(b)(2) and (b)(3) classes do not have independent counsel, seek distinct relief, have non-overlapping membership, and . . . are certified as settlement-only." *Id.* at 235.

None of the issues identified by *Payment Card Interchange* is presented in this case. Campbell represents a 23(b)(3) class pursuing monetary damages only and the class was not certified for settlement purposes only. Leasing Defendants do not identify how Campbell's status as class

representative creates an unacceptable incentive as she advocates for the SKS Post-Lease Expiration Class.

Campbell, like the proposed class, is a merchant who appeared on Schedule 1. She asserts that Leasing Defendants collected or tried to collect taxes that were not due or paid to any taxing authority and alleges injury based on a course of conduct that is not unique to her.

The district court did not commit a clear error of judgment in concluding that Campbell had standing to assert a RICO claim and that she would not be subject to unique defenses such that typicality would be defeated, nor did it so err in ultimately determining that Campbell met the typicality requirement. We conclude that the nature of Campbell's individual claim is reasonably coextensive with that of the class merchants found on Schedule 1. *See Hanlon*, 150 F.3d at 1020; *Parsons*, 754 F.3d at 686.

## 2. Commonality and Predominance

"The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case, and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1022). "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

Leasing Defendants argue that the district court erred in certifying the SKS Post-Lease Expiration Class because damages are not capable of measurement on a classwide basis

and because individualized issues regarding Campbell's reliance predominate.

Rule 23(b)(3)'s predominance requirement takes into account questions of damages. "[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987–88 (9th Cir. 2015) (quoting *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). To satisfy this requirement, plaintiffs must show that "damages are capable of measurement on a classwide basis," in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory. *Comcast*, 133 S. Ct. at 1433–35. However, "damage calculations alone cannot defeat certification." *Yokoyama*, 594 F.3d at 1094. "[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva*, 716 F.3d at 514. In a civil RICO action, the measure of damages "is the harm caused by the predicate acts constituting the illegal pattern." *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 451 (9th Cir. 1991). To gain class certification, Plaintiffs need to be able to allege that their damages arise from a course of conduct that impacted the class. But they need not show that each members' damages from that conduct are identical.

Leasing Defendants contend that Plaintiffs cannot establish predominance because the damages model advanced by Campbell is not capable of classwide proof. Leasing Defendants stress that the economic impact of the unauthorized ACH debits can be calculated, but Campbell's harm requires a completely different measurement.

In Plaintiffs' motion for class certification, Plaintiffs gave examples of methods for calculating damages. Plaintiffs stressed that it would be easy to identify amounts associated with wrongful ACH withdrawals because Defendants maintained searchable computer records of each lease and each transaction, and because the disputed transactions used common descriptors. Plaintiffs also offered that class members could calculate other damages using their own records. At the hearing on Plaintiffs' motion for class certification, Plaintiffs again proposed these methods for measuring damages: either class members could establish the unauthorized ACH debits or show the "time and effort preventing them from getting money."

Certainly some individual issues may arise in calculating damages, particularly for class members whose funds were never debited from their bank accounts. However, Plaintiffs generally will be able to "show that their damages stemmed from the [Leasing Defendants'] actions that created the legal liability." *Pulaski*, 802 F.3d 987–88. That some individualized calculations may be necessary does not defeat finding predominance. *Id.* This case is unlike *Comcast*, where the Court noted that the courts below did not probe whether the damages model proposed in the antitrust class action measured damages attributable to the plaintiffs' theory of harm. *See* 133 S. Ct. at 1435. There, because the model proposed did not "even attempt to" measure only damages attributable to the legal theory, "it [could not] possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 1433.

This case presents no issue similar to the one in *Comcast*. Plaintiffs propose measuring damages that are directly attributable to their legal theory of the harm. If class

members establish Leasing Defendants' liability, damages can be calculated based on (1) the amount of fees, if any, deducted from their bank accounts after their leases were terminated using Leasing Defendants' own records, and (2) expenses, if any, spent by class members in investigating the scheme using their own records. At this stage, Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability, and have proposed as much here.

Leasing Defendants also contend that Plaintiffs did not establish commonality and predominance because issues of reliance are highly individualized. Leasing Defendants contend that for Campbell to succeed on her RICO claim, she "must prove that she received and read a Notice of Debt, that she decided to investigate, and that she incurred monetary damage as a result of that decision. If these issues applied to the entire class, they could not be proved on a classwide basis." Leasing Defendants argue this individual issue predominates over any common issues.

The district court properly identified several common questions and determined they predominate in Plaintiffs' RICO claim. These questions include the propriety of Leasing Defendants' simulation to determine whether taxes were due, whether class members' ACH form agreements authorized the deductions after their leases had expired, and whether ACH processors relied on fraudulent misrepresentations by Leasing Defendants when they processed the debits. These issues are "of such a nature that [they are] capable of classwide resolution." *Wal-Mart*,

564 U.S. at 350.[3]  Although there are individualized issues related to Campbell's injury, common questions exist and predominate for the alleged RICO violation.  The district court did not abuse its discretion in so concluding.

## B.  The Property Tax Equipment Class

Leasing Defendants also appeal the district court's certification of the Property Tax Equipment Class—the class of persons and businesses who paid property taxes based on the Acquisition Cost rather than the Equipment Cost.  Leasing Defendants argue that Plaintiffs did not establish commonality, predominance, or superiority.

### 1.  Commonality and Predominance

In certifying the Property Tax Equipment Cost Class, the district court identified the following common questions that predominate:  whether Leasing Defendants' use of the Acquisition Cost to calculate taxes was improper, whether

---

[3] Other common questions exist in this action.  To prove Leasing Defendants committed a RICO violation under 18 U.S.C. § 1962(c), Plaintiffs will need to show: (1) Leasing Defendants are persons as defined in 18 U.S.C. § 1961(3); (2) Leasing Defendants conducted or participated in the complained of conduct; (3) Leasing Defendants participation in the conduct is part of an enterprise as defined in 18 U.S.C. § 1961(4); and (4) Leasing Defendants participation in the enterprise was performed through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  These issues are appropriate for classwide litigation because they focus on Leasing Defendants' conduct.  Whether Leasing Defendants were part of an enterprise operating an alleged scheme to defraud class members can be resolved on a classwide basis.  *See, e.g.*, *Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 541 (N.D. Cal. 2015); *In re United Energy Corp. Solar Power Modules Tax Shelter Investments Sec. Litig.*, 122 F.R.D. 251, 255 (C.D. Cal. 1988).

Leasing Defendants had a fiduciary duty to Plaintiffs to calculate their taxes properly when they assumed the duty to assess and pay taxes on Plaintiffs' behalf, and whether Leasing Defendants breached their fiduciary duty by using the Acquisition Cost to calculate taxes.

Leasing Defendants argue that the district court incorrectly assumed that the Acquisition Cost is an "inflated figure," and this assumption has no factual support in the record. We disagree that this argument is pertinent at this stage. Plaintiffs have alleged that the Acquisition Cost amounted to thousands of dollars for a piece of equipment only worth a few hundred dollars, and that Leasing Defendants assessed property taxes on the total commission paid to the ISO rather than the true equipment cost. In their motion for class certification, Plaintiffs gave examples from two class members seeking to represent the Property Tax Equipment Class: Plaintiff Just Film's Acquisition Cost was listed at $5,429.19 and Plaintiff Dietz Towing at $3,686. The Equipment Cost was listed at $358. Plaintiffs stress that the "difference between the two tax bases is significant" and that by switching from the Acquisition Cost to the Equipment Cost as the tax base, the property tax liability lowered significantly. Plaintiffs also offered the deposition testimony of Defendant Northern Leasing's Rule 30(b)(6) witness who conceded that using the Acquisition Cost was a mistake, and that Defendants should have used Equipment Cost as the tax base. The witness also stated that by switching from the Acquisition Cost to the Equipment Cost, the property tax liability would be "much less." Plaintiffs' position in this regard may or may not prevail, but that is a merits question not appropriately addressed at the class certification stage. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) ("Rule 23(b)(3) requires a showing that

*questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."); *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1112 (9th Cir. 2014) (stating that "demonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies").

Next, Leasing Defendants argue that Plaintiffs presented no evidence regarding the variation in tax rates, and that because of the variation, certifying a national class is inappropriate. Leasing Defendants misconstrue Plaintiffs' legal theory for their breach of contract claim. Plaintiffs contend that Defendants MBF Leasing and Northern Leasing breached their contracts by using the Acquisition Cost instead of the Equipment Cost to assess property taxes and charging those assessment amounts to the class. As the district court reasoned, no matter the tax rate in the various jurisdictions, using the Acquisition Cost would amount to an incorrect tax assessment. Whether Leasing Defendants' conduct breached any contractual obligation turns on whether use of the Acquisition Cost, rather than the Equipment Cost, was improper under the contract. Because interpretation of the leasing contracts would predominate, the district court did not err in finding that Plaintiffs established commonality and predominance as to the Property Tax Equipment Class Lease.

Leasing Defendants also argue that determining whether it was improper to calculate property taxes using the Acquisition Cost requires one to assemble the laws of 3,500 taxing jurisdictions. But Plaintiffs do not argue that using the Acquisition Cost is wrong based on the laws of each taxing jurisdiction. Rather, they contend that Leasing Defendants breached their contracts by choosing to calculate taxes using

the Acquisition Cost, rather than the Equipment Cost, as the base.[4]

The district court did not abuse its discretion in concluding that common questions—including whether Leasing Defendants' use of the Acquisition Cost to calculate property taxes breached the parties' lease contracts—predominate.

## 2. Superiority

In addition to establishing predominance of a common question, a class proponent must also demonstrate that the class action is superior to other methods of adjudicating the controversy. Fed. R. Civ. P. 23(b)(3); *see Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235 (9th Cir. 1996).

Leasing Defendants argue that Plaintiffs did not establish superiority because the number of taxing jurisdictions involved in this case makes adjudication unmanageable. Again, Leasing Defendants' argument manufactures a manageability issue that does not exist. The factfinder will determine as a matter of contract whether Leasing Defendants improperly calculated property taxes using the Acquisition

---

[4] Both parties discuss whether use of the Acquisition Cost as the tax basis breached contractual obligations and whether use of this tax base was arbitrary or irrational under New York law. These discussions, however, encompass the merits of Plaintiffs' claim, which we decline to address as it is not relevant to determining whether Plaintiffs met the requirements for class certification. *See Amgen*, 133 S. Ct. at 1194–95 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

Cost. Calculating the differences in the taxed amounts between the Acquisition Cost and the Equipment Cost, as it pertains to measuring damages, would then require applying the laws of the various taxing jurisdictions.

The district court did not err in determining that Plaintiffs satisfied the superiority requirement. If a class action is not superior, then individual actions must carry the day. The court concluded that the "risks, small recovery, and relatively high costs of litigation" make it unlikely that plaintiffs would individually pursue their claims. These considerations are at the heart of why the Federal Rules of Civil Procedure allow class actions in cases where Rule 23's requirements are satisfied. This case vividly points to the need for class treatment. The individual damages of each merchant are too small to make litigation cost effective in a case against funded defenses and with a likely need for expert testimony. The district court also found that class action was superior because litigation on a classwide basis would promote greater efficiency in resolving the classes' claims. *See Valentino*, 97 F.3d at 1234.

## IV

The district court did not abuse its discretion in certifying the SKS Post-Lease Expiration Class and the Property Tax Equipment Cost Basis Class. We affirm the district court's class certification orders.

**AFFIRMED.**